1

2

    ——— FILED    ——— ENTERED
    ——— LODGED   ——— RECEIVED

    JAN 25 2010   LK

3

    AT SEATTLE
    CLERK U.S. DISTRICT COURT
  WESTERN DISTRICT OF WASHINGTON
            DEPUTY

4

5

6

7
        UNITED STATES DISTRICT COURT

8
        WESTERN DISTRICT OF WASHINGTON
              AT SEATTLE

9
FEDERAL HOME LOAN BANK OF   )

10
SEATTLE, a bank created by federal law,  )

                )   NO. **C10- 148**

11
             Plaintiff,  )   **NOTICE OF REMOVAL**

                )

12
v.                  )

                )

13
COUNTRYWIDE SECURITIES     )

CORPORATION, a California corporation; )   **10-CV-00148-CMP**

14
CWALT, INC., a Delaware corporation;  )

COUNTRYWIDE FINANCIAL     )

15
CORPORATION, a Delaware corporation; )

MERRILL LYNCH MORTGAGE    )

16
INVESTORS, INC., a Delaware corporation; )

and MERRILL LYNCH MORTGAGE   )

17
CAPITAL, INC., a Delaware corporation,  )

                )

18
           Defendants.  )

19
    PLEASE TAKE NOTICE that, on this date, defendants Countrywide Securities

20
Corporation, CWALT, Inc., Countrywide Financial Corporation, Merrill Lynch Mortgage

21
Investors, Inc., and Merrill Lynch Mortgage Capital, Inc., (collectively, the "Removing

22
Defendants") hereby remove the above-captioned case pending in the Superior Court of

23
Washington for King County to the United States District Court for the Western District of

24
Washington.[1] The grounds for removal are set forth below.

25
   ————————————————

   [1]  The Removing Defendants appear specially for the purpose of removal only. They reserve all defenses,

26
      jurisdictional or otherwise, available to them.

NOTICE OF REMOVAL - 1
CASE NO.

**ORIGINAL**

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

116589.0159/1802519.1

1

**SUMMARY**

2       1.      All claims and causes of action in this matter may be removed to this Court

3   under 28 U.S.C. § 1441 because (i) this Court has original jurisdiction over this matter

4   pursuant to the charter of Plaintiff Federal Home Loan Bank of Seattle ("FHLB Seattle"), (ii)

5   this Court has original jurisdiction over this matter under 28 U.S.C. § 1345 on the ground that

6   FHLB Seattle is an agency of the United States with express congressional authority to sue,

7   and (iii) this Court has original jurisdiction over this matter under 28 U.S.C. § 1332 on the

8   basis of the parties' complete diversity of citizenship.

9

**PROCEDURAL HISTORY**

10      2.      On December 23, 2009, FHLB Seattle filed a summons and complaint in this

11  action in the Superior Court of Washington for King County.  The case was captioned Federal

12  Home Loan Bank of Seattle v. Countrywide Securities Corporation, et al. and was assigned

13  Case Number 09-2-46321-2 SEA.

14      3.      The earliest date that Plaintiff served any of the Removing Defendants is

15  December 28, 2009.  In accordance with 28 U.S.C. § 1446(a), copies of process, pleadings,

16  and orders served on the Removing Defendants are attached hereto as Exhibit A.  Copies of

17  affidavits of service of the Complaint and Summons by hand, filed by Plaintiff and available

18  from the Superior Court of Washington for King County, are attached hereto as Exhibit B.

19      4.      The Complaint concerns FHLB Seattle's purchase of securities that entitle

20  FHLB Seattle to receive a share of the mortgage payments made by thousands of

21  homeowners.  The Complaint alleges, among other things, that certain written materials

22  issued in connection with the offering of the securities contained untrue or misleading

23  statements, allegedly in violation of the Securities Act of Washington, RCW 21.20.005, et

24  seq.  Those securities are designated as Alternative Loan Trust, Mortgage Pass-Through

25  Certificates, Series 2007-OH3 ("2007-OH3"), Alternative Loan Trust, Mortgage Pass-

26  Through Certificates, Series 2007-OH2 ("2007-OH2"), Alternative Loan Trust, Mortgage

NOTICE OF REMOVAL - 2
CASE NO.

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

1    Pass-Through Certificates, Series 2006-OA19 ("2006-OA19"), Alternative Loan Trust,

2    Mortgage Pass-Through Certificates, Series 2006-OA6 ("2006-OA6"), Alternative Loan

3    Trust, Mortgage Pass-Through Certificates, Series 2006-OA2 ("2006-OA2"), and Merrill

4    Lynch Mortgage Investors Trust, Mortgage Pass-Through Certificates, Series 2004-C ("2004-

5    C") (collectively, the "Certificates").

6         5.      The Removing Defendants dispute that they have any liability whatsoever to

7    Plaintiff.

8         6.      The Removing Defendants' time to answer the Summons and Complaint has

9    not expired, and none of the Removing Defendants has served or filed an answer.

10        7.      No motions or other proceedings in this action are pending in the Superior

11   Court of Washington for King County.

12        8.      This notice of removal is timely under 28 U.S.C. § 1446(b) because it is being

13   filed within thirty (30) days after receipt of the Summons and Complaint.

### REMOVAL UNDER 28 U.S.C. § 1441

15        9.      This action is removable under 28 U.S.C. § 1441(a), which provides that:

16             Except as otherwise expressly provided by Act of Congress, any
               civil action brought in a State court of which the district courts
17             of the United States have original jurisdiction, may be removed
               by the defendant or the defendants, to the district court of the
18             United States for the district and division embracing the place
               where such action is pending.
19

### The Federal Home Loan Bank Act

20        10.     The United States Supreme Court has made clear that this Court has original

21   jurisdiction over this matter pursuant to FHLB Seattle's charter.  Plaintiff is one of twelve

22   Federal Home Loan Banks created by Congress under the Federal Home Loan Bank Act of

23   1932.  See Cmplt. ¶ 2.  Its charter is codified in that Act.  See 12 U.S.C. § 1421, et seq.  The

24   Federal Home Loan Bank Act provides that all Federal Home Loan Banks "shall have power

25   . . . to sue and be sued, to complain, and to defend, in any court of competent jurisdiction,

26

NOTICE OF REMOVAL - 3
CASE NO.

1  State or Federal." 12 U.S.C. § 1432(a). The United States Supreme Court has held that "a

2  congressional charter's 'sue and be sued' provision may be read to confer federal court

3  jurisdiction" where, as here, "it specifically mentions the federal courts." <u>Am. Nat'l Red</u>

4  <u>Cross v. S.G.</u>, 505 U.S. 247, 255 (1992). As the dissent in <u>Red Cross</u> confirmed: "The Court

5  today concludes that whenever a statute granting a federally chartered corporation the 'power

6  to sue and be sued' specifically mentions the federal courts (as opposed to merely embracing

7  them within general language), the law will be deemed . . . to confer on federal district courts

8  <u>jurisdiction</u> over any and all controversies to which that corporation is a party." <u>Id.</u> at 265

9  (Scalia, J., dissenting) (emphasis in original).

10      11.     Following <u>Red Cross</u>, the D.C. Circuit – the only Court of Appeals to

11  consider the issue – applied <u>Red Cross</u> to the "sue and be sued" provision in the charter of the

12  Federal National Mortgage Association ("Fannie Mae"). The "sue and be sued" language in

13  Fannie Mae's charter is virtually identical to the "sue and be sued" provision in FHLB

14  Seattle's charter.[2]   The D.C. Circuit held "that express reference to federal courts in a

15  federally chartered entity's sue-and-be-sued clause was necessary and <u>sufficient</u> to confer

16  jurisdiction." <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Raines</u>, 534 F.3d

17  779, 784 (D.C. Cir. 2008) (internal quotation marks omitted) (emphasis added). "Applying

18  the <u>Red Cross</u> rule to the present case," the D.C. Circuit found "that there is federal

19  jurisdiction because the Fannie Mae 'sue and be sued' provision expressly refers to the federal

20  courts in a manner similar to the Red Cross statute." <u>Id.</u>[3]

21

22  [2]  Fannie Mae's charter also authorizes it "to sue and to be sued, and to complain and to defend, in any court
     of competent jurisdiction, State or Federal . . . ." 12 U.S.C. § 1723a(a).

23  [3]  <u>Accord In re Fannie Mae 2008 Sec. Litig.</u>, Nos. 08 Civ. 7831 (PAC), 09 Civ. 1352 (PAC), 2009 WL
     4067266, at *1, 3 (S.D.N.Y. Nov. 24, 2009) ("sue and be sued" language in Fannie Mae charter confers

24  removal jurisdiction); <u>Peoples Mortgage Co. v. Fed. Nat'l Mortgage Ass'n</u>, 856 F. Supp. 910, 917 (E.D. Pa.
     1994) (same); <u>Grun v. Countrywide Home Loans, Inc.</u>, No. Civ.A.SA-03-CA-0141-XR, 2004 WL 1509088,

25  at *2 (W.D. Tex. July 1, 2004) (same); <u>Connelly v. Fed. Nat'l Mortgage Ass'n</u>, 251 F. Supp. 2d 1071, 1072-
     73 (D. Conn. 2003) (same); <u>C.C. Port, Ltd. v. Davis-Penn Mortgage Co.</u>, 891 F. Supp. 371, 372 (S.D. Tex.

26  1994), <u>aff'd</u>, 61 F.3d 288 (5th Cir. 1995) (same).

NOTICE OF REMOVAL - 4
CASE NO.

116589.0159/1802519.1

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

1    12.    Citing Red Cross and Pirelli, FHLB Seattle's sister bank, the Federal Home

2    Loan Bank of Des Moines ("FHLB Des Moines"), has asserted precisely this ground as a

3    basis for removal.  See O'Connor Enter. Group v. Spindustry Sys. Inc., Civ. No. 4:09-CV-

4    01483 (S.D. Tex. May 18, 2009) (FHLB Des Moines' Notice of Removal ¶ 2, Docket No. 1)

5    (attached hereto as Exhibit C); Ewing v. Fed. Home Loan Bank of Des Moines, No. 4:09-cv-

6    106 (S.D. Iowa 2009) (FHLB Des Moines' Amended Notice of Removal ¶¶ 13-15, Docket

7    No. 6) (attached hereto as Exhibit D).  O'Connor remains in federal court; and the Ewing

8    court found that it had jurisdiction, Ewing v. Fed. Home Loan Bank of Des Moines, 645 F.

9    Supp. 2d 707, 709 (S.D. Iowa 2009).[4]

10   13.    Accordingly, this action is removable under 28 U.S.C. § 1441.

11   **FHLB Seattle Is an Agency of the United States**

12   14.    This Court has original jurisdiction over this matter under 28 U.S.C. § 1345

13   because FHLB Seattle is an agency of the United States with express congressional authority

14   to sue.

15   15.    Section 1345 provides that "the district courts shall have original jurisdiction

16   of all civil actions, suits or proceedings commenced by the United States, or by any agency

17   or officer thereof expressly authorized to sue by Act of Congress."

18   16.    The Court of Appeals for the Ninth Circuit has held that Federal Home Loan

19   Banks – like FHLB Seattle – are agencies of the United States.  See Rust v. Johnson, 597

20   F.2d 174, 178 (9th Cir. 1979) ("A survey of the cases involving . . . the Federal home loan

21   banks reveals that they are treated as federal instrumentalities engaged in the performance of

22   governmental functions even though their stock may be privately owned."); Fahey v.

23   O'Melveny & Myers, 200 F.2d 420, 446-47 (9th Cir. 1953) ("We hold that all Federal Home

24

25   [4]   Accord Ass'n of Data Processing Serv. Orgs., Inc. v. Fed. Home Loan Bank of Cincinnati, 421 F. Supp.
384, 392 (S.D. Ohio 1976) (holding that federal court jurisdiction existed under, among other bases, the "sue

26   and be sued" clause of the Federal Home Loan Banks' congressional charter).

NOTICE OF REMOVAL - 5
CASE NO.

1  Loan Banks within the System are, and operate as, public agencies and instrumentalities of

2  the federal government.").

3        17.    Federal Home Loan Banks – like FHLB Seattle – are also expressly

4  authorized to sue by their chartering statute, the Federal Home Loan Bank Act, 12 U.S.C.

5  § 1421, et seq.  See 12 U.S.C. § 1432(a) (All Federal Home Loan Banks "shall have power

6  . . . to sue and be sued, to complain, and to defend, in any court of competent jurisdiction,

7  State or Federal.").

8        18.    Therefore, this action meets the requirements for original jurisdiction under

9  28 U.S.C. § 1345 and may be removed under 28 U.S.C. § 1441.  See Fed. Home Loan Bank

10  of San Francisco v. Long Beach Fed. Sav. & Loan Ass'n Title Service Co., 122 F. Supp.

11  401, 414, 462 (S.D. Cal. 1954) (holding that the Federal Home Loan Bank of San Francisco

12  "comes within the requirements for original jurisdiction of Section 1345 of Title 28,

13  U.S.Code, as an 'agency of the United States' which is 'expressly authorized to sue by Act

14  of Congress'" and denying a motion to remand).

15                              **Diversity Jurisdiction**

16        19.    Removal is also proper under 28 U.S.C. § 1441 because this Court has

17  original jurisdiction over this matter under 28 U.S.C. § 1332 on the basis of complete

18  diversity of citizenship.

19        20.    This action satisfies the complete diversity requirement of 28 U.S.C.

20  § 1332(a)(1).  The Removing Defendants are citizens of California or Delaware.  See Cmplt.

21  ¶¶ 3-7.  Plaintiff is a citizen of Washington.

22        21.    When Congress incorporates a federally chartered corporation as a "body

23  corporate" of a particular state, then it is a citizen of that state for diversity purposes.  Lehman

24  Bros. Bank, FSB v. Frank T. Yoder Mortgage, 415 F. Supp. 2d 636, 639-40 (E.D. Va. 2006);

25  Commercial Fed. Bank v. Dorado Network Sys. Corp., No. 8:05CV391, 2005 WL 2218421,

26  at *3 (D. Neb. Sept. 13, 2005).  FHLB Seattle has been incorporated as a "body corporate" of

NOTICE OF REMOVAL - 6
CASE NO.

the State of Washington under the Federal Home Loan Bank Act, 12 U.S.C. § 1421, et seq., and FHLB Seattle's organization certificate (attached hereto as Exhibit E, excerpted from FHLB Seattle's Form 10-12G dated March 31, 2006).[5]  The Act provides that each Federal Home Loan Bank "shall become, as of the date of the execution of its organization certificate, a body corporate."  12 U.S.C. § 1432(a).  FHLB Seattle's organization certificate provides that it will be established in the State of Washington and that the location of its principal office will be in the State of Washington.  See Exhibit E, ¶¶ 2-3.  Here, Plaintiff is the Federal Home Loan Bank of Seattle, Washington; and FHLB Seattle is therefore a citizen of Washington for diversity purposes.

22.     Not surprisingly, FHLB Des Moines has asserted this ground as a basis for removal, acknowledging that it was "a federal instrumentality created by Congress with its principal place of business in Iowa" and, consequently, a citizen of Iowa for diversity jurisdiction purposes.  See Exhibit C, ¶ 4.

23.     A separate and independent reason why FHLB Seattle is a citizen of the state of Washington is that its activities are localized in Washington State.   When a federally chartered corporation's activities are sufficiently localized in a given state, despite some out-of-state business activities, then it is a citizen of that state for diversity purposes.  Loyola Fed. Sav. Bank v. Fickling, 58 F.3d 603, 606 (11th Cir. 1995).  To determine whether a federal corporation is localized for diversity purposes, courts consider: (1) the principal place of business; (2) the existence of branch offices outside of the state; (3) the amount of business transacted in different states; and (4) any other evidence that the corporation is local or national in nature.  Id.  No single factor is determinative, and the exception is not limited to corporations that conduct all of their activities in one state.  Id.  Here, FHLB Seattle's

---

[5]   Plaintiff's initial organization certificate provided that it "shall be established in the City of Spokane, State of Washington" and named the "Federal Home Loan Bank of Spokane."  See Ex. E, ¶¶ 1-2.  Plaintiff is now known as the "Federal Home Loan Bank of Seattle."

NOTICE OF REMOVAL - 7
CASE NO.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON  98101-2338
206.223.7000 FAX: 206.223.7107

activities are localized in Washington because, among other reasons, (1) its principal place of business is located in Washington, see supra ¶ 21, and (2) nearly twice as many of its approximately 390 member financial institutions and primary customers are located in Washington State as in any other state, see http://www.fhlbsea.com/OurCompany/Membership/MemberDirectory.aspx (attached hereto as Exhibit F) (listing FHLB Seattle's members as of January 13, 2010: 121 are citizens of Washington, 68 are citizens of Montana, 59 are citizens of Oregon, 53 are citizens of Utah, 34 are citizens of Wyoming, 22 are citizens of Idaho, 16 are citizens of Hawaii, and 11 are citizens of Alaska). Thus, FHLB Seattle is properly considered a citizen of Washington for diversity jurisdiction purposes.

24.     This action satisfies the amount-in-controversy requirement because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

a.     Plaintiff seeks rescission of Certificate 2007-OH3, which it allegedly purchased for $79,273,133. See Cmplt. ¶¶ 22-23, 79.

b.     Plaintiff seeks rescission of Certificate 2007-OH2, which it allegedly purchased for $150,000,000. See Cmplt. ¶¶ 81-82, 122.

c.     Plaintiff seeks rescission of Certificate 2006-OA19, which it allegedly purchased for $75,000,000. See Cmplt. ¶¶ 124-25, 165.

d.     Plaintiff seeks rescission of Certificate 2006-OA6, which it allegedly purchased for $47,632,633. See Cmplt. ¶¶ 167-68, 208.

e.     Plaintiff seeks rescission of Certificate 2006-OA2, which it allegedly purchased for $100,000,000. See Cmplt. ¶¶ 210-11, 249.

f.     Plaintiff seeks rescission of Certificate 2004-C, which it allegedly purchased for $9,944,998. See Cmplt. ¶¶ 251-52, 287.

Although the Removing Defendants deny that Plaintiff or any of its constituent members is entitled to any monetary recovery or other relief with respect to the claims asserted in the

NOTICE OF REMOVAL - 8
CASE NO.

1    Complaint, Plaintiff's alleged amount in controversy exceeds the $75,000 amount in

2    controversy requirement.

3                    **OTHER PROCEDURAL REQUIREMENTS**

4         25.    Promptly upon the filing of this Notice of Removal, a true copy of it will be

5    provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).  Pursuant to Federal Rule of

6    Civil Procedure 5(d), the Removing Defendants will file with this Court a Certificate of

7    Service of Notice to Adverse Parties of Removal to Federal Court.

8         26.    Concurrently with the filing of this Notice of Removal, the Removing

9    Defendants are filing a Notification of Filing of Notice of Removal with the Clerk of the

10   Superior Court of Washington for King County in accordance with 28 U.S.C. § 1446(d).

11        27.    This Notice of Removal is signed pursuant to Federal Rule of Civil Procedure

12   11.  See 28 U.S.C. § 1446(a).

13        28.    All Removing Defendants join in this Notice of Removal and consent to the

14   removal of this action to this Court, subject to and without waiving any defenses and rights

15   available to them.

16        WHEREFORE, this action should proceed in the United States District Court for the

17   Western District of Washington, as an action properly removed to this Court.

18   ///

19

20   ///

21   ///

22

23   ///

24

25   ///

26   ///

     NOTICE OF REMOVAL - 9
     CASE NO.

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

1

2   DATED: January 25, 2010

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Respectfully submitted,

**LANE POWELL PC**

By: _____
    John S. Devlin III, WSBA #23988
    1420 Fifth Avenue, Suite 4100
    Seattle, WA 98101-2338
    Telephone: (206) 223-6280
    Fax: (206) 223-7101
    E-mail: DevlinJ@LanePowell.com

Brian E. Pastuszenski
Sarah Heaton Concannon
Daniel Roeser
(*pro hac vice* applications forthcoming)
Goodwin Procter LLP
Exchange Place
53 State Street
Boston MA 02109
Telephone: (617) 570-1000
Facsimile: (617) 523-1231

ATTORNEYS FOR DEFENDANTS
COUNTRYWIDE SECURITIES
CORPORATION, CWALT, INC.,
COUNTRYWIDE FINANCIAL
CORPORATION, MERRILL LYNCH
MORTGAGE INVESTORS, INC., AND
MERRILL LYNCH MORTGAGE CAPITAL,
INC.

NOTICE OF REMOVAL - 10
CASE NO.

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4100
SEATTLE, WASHINGTON 98101-2338
206.223.7000 FAX: 206.223.7107

**CERTIFICATE OF SERVICE**

I hereby certify that on January 25, 2010, I caused to be served a copy of the foregoing **NOTICE OF REMOVAL** on the following person(s) in the manner indicated below at the following address(es):

| | | |
|---|---|---|
| Richard C. Yarmuth, WSBA #4990 | ☐ | by **Electronic Mail** |
| Matthew Carvalho, WSBA #31201 | ☐ | by **Facsimile Transmission** |
| Yarmuth Wilsdon Calfo PLLC | ☐ | by **First Class Mail** |
| 818 Stewart Street | ☒ | by **Hand Delivery** |
| Seattle, WA 98101 | ☐ | by **Overnight Delivery** |
| (206) 516-3800  FAX (206) 516-3888 | | |

Signed this 25th day of January, 2010 at Seattle, Washington.

_____
Leah Burrus

NOTICE OF REMOVAL - 11
CASE NO.

**12**

# EXHIBIT  A

**FILED**

09 DEC 23 PM 2:13

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46321-2 SEA

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF SEATTLE, a bank created by federal law,<br><br>Plaintiff,<br><br>v.<br><br>COUNTRYWIDE SECURITIES CORPORATION, a California corporation; CWALT, INC., a Delaware corporation; COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; MERRELL LYNCH MORTGAGE INVESTORS, INC., a Delaware corporation; and MERRILL LYNCH MORTGAGE CAPITAL, INC., a Delaware corporation,<br><br>Defendants. | No.<br><br>COMPLAINT FOR RESCISSION |

## I. SUMMARY OF THIS COMPLAINT

1.     This is an action under the Securities Act of Washington, RCW 21.20.005 *et seq.*, to rescind the purchase and sale of six certificates backed by residential mortgage loans, which the defendants sold the plaintiff for $79,273,133, $150,000,000, $75,000,000, $47,632,633, $100,000,000, and $9,944,998, respectively. When they offered and then sold these certificates to the plaintiff, the defendants made numerous statements to the plaintiff

COMPLAINT FOR RESCISSION – Page 1

**III**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

13

about the certificates and the credit quality of the mortgage loans that backed them. Many of those statements were untrue. Moreover, the defendants omitted to state many material facts that were necessary in order to make their statements not misleading. For example, the defendants made untrue statements, or omitted important information, about such material facts as the percentage of equity that borrowers had in their homes (reflected in the loan-to-value ratio, or the ratio of the amount of the mortgage loan to the value of the house that secured the loan), the number of borrowers who actually lived in the houses that secured their loans, the credit scores of the borrowers, and the business practices of the lenders that made the loans. Plaintiff reasonably relied on these untrue statements and omissions of important information in deciding to purchase the certificates. Under the Act, plaintiff therefore is entitled to rescind its purchase of these certificates, and the defendants are required to repurchase the certificates from the plaintiff for their original purchase prices, plus interest at 8% per annum, plus the costs and legal fees that plaintiff will incur in this action, minus distributions that plaintiffs have received on the certificates.

## II. PARTIES

2.      The plaintiff, Federal Home Loan Bank of Seattle (referred to in this complaint as Seattle Bank), is a bank created by the Federal Home Loan Bank Act. Under its Organization Certificate, Seattle Bank is to operate in Federal Home Loan Bank District Number 12, which comprises the States of Alaska, Hawaii, Idaho, Montana, Oregon, Utah, Washington, and Wyoming, as well as certain territories of the United States. Seattle Bank does operate throughout those States and territories.

COMPLAINT FOR RESCISSION – Page 2

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

3.     Defendant Countrywide Securities Corporation (referred to as Countrywide Securities) is a corporation organized under the laws of California.

4.     Defendant CWALT, Inc. (referred to as CWALT) is a corporation organized under the laws of Delaware.

5.     Defendant Countrywide Financial Corporation is a corporation organized under the laws of Delaware.

6.     Defendant Merrill Lynch Mortgage Investors, Inc. (referred to as Merrill Lynch Mortgage Investors) is a corporation organized under the laws of Delaware.

7.     Defendant Merrill Lynch Mortgage Capital, Inc. is a corporation organized under the laws of Delaware.

8.     On information and belief, Countrywide Financial Corporation participated in the operations of CWALT and had the power to control the conduct of CWALT in the transactions involved in this complaint. Under RCW 21.20.430(3), Countrywide Financial Corporation directly or indirectly controlled CWALT and is therefore liable to Seattle Bank jointly and severally with and to the same extent as CWALT.

9.     On information and belief, Merrill Lynch Mortgage Capital, Inc. participated in the operations of Merrill Lynch Mortgage Investors and had the power to control the conduct of Merrill Lynch Mortgage Capital in the transactions involved in this complaint. Under RCW 21.20.430(3), Merrill Lynch Mortgage Capital, Inc. directly or indirectly controlled Merrill Lynch Mortgage Investors and is therefore liable to Seattle Bank jointly and severally with and to the same extent as Merrill Lynch Mortgage Investors.

### III. JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under RCW 2.08.010.

COMPLAINT FOR RESCISSION – Page 3

11.     This Court has personal jurisdiction over each of the defendants because each of them offered and sold the securities referred to in this complaint to Seattle Bank in King County.

12.     Venue is proper in this Court pursuant to RCW 4.12.025 because one or more defendants transacts business in King County.

### IV. SECURITIZATION OF MORTGAGE LOANS

13.     The securities that the defendants sold Seattle Bank are so-called **asset-backed securities**, or **ABS**, created in a process known as **securitization**. Securitization begins with loans (for example, loans secured by mortgages on residential properties, credit card loans, etc.) on which the borrowers are to make payments, usually monthly. The entity that makes the loans is known as the **originator** of the loans. The process by which the originator decides whether to make particular loans is known as the **underwriting** of loans. In the loan underwriting process, the originator applies various criteria to try to ensure that the loan will be repaid. Until the loans are securitized, the borrowers on the loans make their loan payments to the originator. Collectively, the payments on the loans are known as the **cash flow** from the loans.

14.     In a securitization, a large number of loans, usually of a similar type, are grouped into a **collateral pool**. The originator of those loans sells them (and, with them, the right to receive the cash flow from them) to a **trust**. The trust pays the originator cash for the loans. The trust raises the cash to pay for the loans by selling bonds, usually called **certificates**, to investors such as Seattle Bank. Each certificate entitles its holder to an agreed part of the cash flow from the loans in the collateral pool.

COMPLAINT FOR RESCISSION – Page 4

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

15.    Thus, schematically, there are six steps in a securitization.

    1.    Investors pay money to the trust.

    2.    The trust issues certificates to the investors.

    3.    The trust pays money to the originator.

    4.    The originator sells to the trust the loans in the collateral pool, including the right to receive the cash flow from those loans.

    5.    The trust collects cash flow from payments on the loans in the collateral pool.

    6.    The trust pays each certificateholder its agreed part of the cash flow that the trust receives from payments on loans in the collateral pool.

\*

16.    A few other aspects of securitization may be useful in reading the allegations of this complaint. Each securitization has a **sponsor**, the prime mover of the securitization. Sometimes the sponsor is the originator or an affiliate. In originator-sponsored securitizations, the collateral pool usually contains loans made by the originator that is sponsoring the securitization. Other times, the sponsor may be an investment bank, which purchases loans from one or more originators, aggregates them into a collateral pool, sells them to a trust, and securitizes them. The entity that transfers the loans in the collateral pool to the trust is known as the **depositor**.

17.    The obligor of the certificates in a securitization is the trust that purchases the loans in the collateral pool. Because a trust has no assets other than the loans that it purchased, it may not be able to satisfy the liabilities of an issuer of securities (the certificates). The law therefore considers the **issuer** of an asset-backed certificate to be not the trust that is the obligor on the certificate, but rather the depositor.

18.    Finally, certificates issued in securitizations are purchased from the trust and sold to investors by firms acting as **securities underwriters**.

COMPLAINT FOR RESCISSION – Page 5

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

19.     When a traditional company issues common shares, bonds, or other securities, it and its underwriters must disclose material information about the business and management of the company to potential investors in those securities. In a securitization trust, however, there is no business or management to describe. Rather, the necessary disclosures are about the structure of the transaction and especially about the credit quality of the loans in the collateral pool, the sole source of cash from which to pay the certificateholders.

20.     Defendants sold to Seattle Bank certificates in six securitizations.

## V. FIRST CLAIM FOR RELIEF

| | |
|---:|:---|
| *Certificate*: | One certificate in tranche A-1-A of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH3 |
| *Date of Purchase*: | August 6, 2007 |
| *Consideration Paid*: | $79,273,133 |
| *Underwriter*: | Countrywide Securities |
| *Depositor/Issuer*: | CWALT |
| *Controlling Person of Depositor/Issuer*: | Countrywide Financial Corporation |

21.     Seattle Bank repeats paragraphs 1 through 20.

22.     Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH3 was a securitization in July 2007 of approximately 1,257 mortgage loans, in one group, with an aggregate principal balance of approximately $587,463,192. The mortgage loans were originated by Countrywide Home Loans, Inc., Flagstar Bank, FSB, and various other undisclosed originators. Countrywide Home Loans, Inc. originated 84.7%, by

COMPLAINT FOR RESCISSION – Page 6

aggregate principal balance, of the mortgage loans in the collateral pool and Flagstar Bank, FSB originated 14.38%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.[1]

23.     Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1-A, for which Seattle Bank paid $79,273,133 on August 6, 2007.

24.     In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[2] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

25.     Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

26.     Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

---

[1] Nonconforming loans include both "alt-A" and "subprime" loans, but there are no precise definitions of those terms.

[2] The prospectus supplement for CWALT 2007-OH3 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000114420407039680/v082380_424b5.htm.

COMPLAINT FOR RESCISSION – Page 7

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

19

1  **A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

2

3      **1.    The materiality of LTVs and CLTVs**

4      27.    The loan-to-value ratio of a mortgage loan, or LTV, is the ratio of the

5  amount of the mortgage loan to the value of the mortgaged property when the loan is made.

6  For example, a loan of $300,000 secured by property valued at $500,000 has an LTV of

7  60%; a loan of $450,000 on the same property has an LTV of 90%. LTV is one of the most

8  important measures of the risk of a mortgage loan, and the LTVs of the mortgage loans in

9  the collateral pool of a securitization are likewise one of the most important measures of the

10  risk of certificates sold in that securitization. LTV predicts the likelihood of default (the

11  lower the LTV, the less likely that a decline in the value of the property will wipe out the

12  owner's equity, and thereby give the owner an incentive to stop making mortgage payments

13  and abandon the property). LTV also predicts the severity of loss in the event of default (the

14  lower the LTV, the greater the "cushion," so the greater the likelihood that the proceeds of

15  foreclosure will cover the unpaid balance of the mortgage loan).

16

17

18      28.    The denominator in LTV (value of the mortgaged property) is determined by

19  either an appraisal or by the purchase price of the property. In a refinancing or home-equity

20  loan, there is no purchase price to use as the denominator. For a purchase, the agreed price

21  may be higher than the value of the property, and an appraisal should ensure that the LTV is

22  calculated using the actual value as the denominator. Sometimes in a purchase, the

23  denominator is the lower of the purchase price or the appraised value.

24

25      29.    Thus, an accurate appraisal is essential to an accurate LTV. In particular, a

26  too-high appraisal will understate, sometimes greatly, the risk of a loan. To return to the

COMPLAINT FOR RESCISSION -- Page 8

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

20

example above, if the property whose actual value is $500,000 is appraised instead at $550,000, then the LTV of the $300,000 loan falls from 60% to 54.5%, and the LTV of the $450,000 loan falls from 90% to 81.8%. In either case, the LTV based on the incorrect appraisal understates the risk of the loan. It is also important to note that, the higher the correct LTV, the more the risk is understated by an incorrect appraisal of any given magnitude. In the example above, there is little difference in the risk of a loan with an LTV of 60% and one with an LTV of 54.5%; both are safe loans with large equity cushions. But there is a very large difference in the risk of a loan with an LTV of 90% and one with an LTV of 81.8%. In the latter case, there is an equity cushion of 18.2% of the value of the property, in the former, only 10%, just over half as much. Thus, an appraisal that overvalues a property by just 10% produces an overstatement of more than 80% in the homeowner's equity.

30.    LTV is an important measure of the risk of a mortgage loan, and the LTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. LTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers LTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average LTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

*

COMPLAINT FOR RESCISSION – Page 9

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

21

31.     Residential properties can secure more than one mortgage loan, a senior (or first) and one or more junior mortgage loans. The combined loan-to-value ratio (CLTV) is the ratio of the total outstanding principal balance of all loans (mortgages or home equity lines of credit) that the property secures to the appraised value of mortgaged property. To return to the example in paragraph 27, if a property valued at $500,000 secures a first mortgage loan of $300,000 and a second mortgage loan of $50,000, then it has a CLTV of 70%. If the first mortgage loan on the same property is $450,000 and the second is $50,000, then the CLTV is 100%.

32.     Like LTV, CLTV is an important measure of the risk of a mortgage loan, and the CLTVs of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. CLTV helps to predict both the likelihood of default and the severity of loss in case of default. A reasonable investor considers CLTV important to the decision whether to purchase a certificate in a securitization of mortgage loans. Even small differences in the weighted average CLTV of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization, and thus, are important to the decision of a reasonable investor whether to purchase any such certificate.

2.     **Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

33.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool in this securitization.

COMPLAINT FOR RESCISSION – Page 10

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1      a.      The weighted average original LTV of all the loans in the collateral

2   pool was 74.96%. CWALT 2007-OH3 Pros. Sup. S-2.

3      b.      The percentage of mortgage loans with an original LTV greater than

4   80% was 6.34%. CWALT 2007-OH3 Pros. Sup. S-2.

5

6      c.      "No Mortgage Loan had a Loan-to-Value Ratio at origination of

7   more than 95%." CWALT 2007-OH3 Pros. Sup. S-39.

8      d.      In Annex A of the prospectus supplement ("The Mortgage Pool"),

9   Countrywide Securities and CWALT presented tables of statistics about the mortgage loans

10  in the collateral pool. Each table focused on a certain characteristic of the loans (for

11  example, current principal balances) and divided the loans into categories based on that

12  characteristic (for example, loans with current principal balances of $0.01 to $50,000,

13  $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various

14  data about the loans in each category. Among these data was the "Weighted Average

15  Original Loan-to-Value Ratio" and the "Weighted Average Combined Loan-to-Value

16  Ratio" of the loans in each category. There were 23 such tables in Annex A for all loans in

17  the collateral pool. In each table, the number of categories into which the loans are divided

18  ranged from one to 43. Thus, in Annex A, Countrywide Securities and CWALT made

19  hundreds of statements about the weighted average original LTVs and CLTVs of the loans

20  in the collateral pool. CWALT 2007-OH3 Pros. Sup. A-1 to A-10.

21

22      e.      "As of the cut-off date, the weighted average original Loan-to-Value

23  Ratio of the Mortgage Loans was approximately 74.96%." CWALT 2007-OH3 Pros. Sup.

24  A-4.

25

26

COMPLAINT FOR RESCISSION – Page 11

III
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

34.     These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

35.     By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

3.     **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.     **Upward bias in appraisals**

36.     As noted above, an accurate appraisal is essential to an accurate LTV and CLTV. During the time before this securitization, however, there was widespread upward bias in appraisals of properties that secured nonconforming mortgage loans and consequent understatement of the LTVs and CLTVs of those loans. The main instigators of this bias were mortgage brokers, real estate brokers, and loan officers who were not paid unless loans closed and properties changed hands, and who thus had a strong incentive to importune appraisers to appraise properties at values high enough to enable transactions to close. (Furnishing an appraisal high enough to enable a transaction to close was known as

COMPLAINT FOR RESCISSION – Page 12

iii
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

24

"hitting the bid." In a sale, this meant ensuring that the appraised value was equal to or greater than the agreed price. In a refinancing or second mortgage, "hitting the bid" meant ensuring that the appraised value was high enough to enable the proposed loan to comply with the lender's requirements for LTV.)

37.     Brokers and loan officers importuned appraisers by threatening to withhold future assignments if an appraiser did not "hit the bid" and sometimes by refusing to pay for completed appraisals that did not "hit the bid."

38.     There is abundant evidence of upward bias in appraisals throughout the mortgage loan industry before the date of this securitization. Starting in 2000 and continuing until 2009, 11,000 appraisers signed a petition addressed to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, an agency of the United States Government whose "mission is to ensure that real estate appraisers, who perform appraisals in real estate transactions that could expose the United States government to financial loss, are sufficiently trained and tested to assure competency and independent judgment according to uniform high professional standards and ethics." In the petition, the 11,000 appraisers wrote:

> We, the undersigned, represent a large number of licensed and
> certified real estate appraisers in the United States, who seek your
> assistance in solving a problem facing us on a daily basis. Lenders
> (meaning any and all of the following: banks, savings and loans,
> mortgage brokers, credit unions and loan officers in general; not to
> mention real estate agents) have individuals within their ranks, who, as a
> normal course of business, apply pressure on appraisers to hit or exceed
> a predetermined value.

> This pressure comes in many forms and includes the following:
> •   the withholding of business if we refuse to inflate values,

COMPLAINT FOR RESCISSION – Page 13

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

- the withholding of business if we refuse to guarantee a predetermined value,

- the withholding of business if we refuse to ignore deficiencies in the property,

- refusing to pay for an appraisal that does not give them what they want,

- black listing honest appraisers in order to use "rubber stamp" appraisers, etc. ·

We request that action be taken to hold the lenders responsible for this type of violation and provide for a penalty on any person or business who engages in the practice of pressuring appraisers to do dishonest appraisals that do not provide for independent judgment. We believe that this practice has adverse effects on our local and national economies and that the potential for great financial loss exists. We also believe that many individuals have been adversely affected by the purchase of homes which have been over-valued.

39.    The first-hand statements of the 11,000 appraisers are corroborated by a nationwide survey of 1,200 appraisers during the second half of 2006, which was conducted by October Research Corporation and reviewed by the statistical consulting service of a major state university. The margin of error in the survey was plus or minus 3.2%. The respondents were asked about their experiences over as much as five years before the date of the survey. The results of the 2006 survey confirmed and elaborated on the findings of a 2003 survey which had found that 55% of appraisers felt "uncomfortable pressure to overstate property values in greater than half of their appraisals."

40.    Specific findings of the survey included:

- "90% of respondent appraisers indicated that they felt pressure to restate/adjust/change property valuations."

- "71% of appraisers indicated that they felt uncomfortable pressure from mortgage brokers to overstate property valuations."

COMPLAINT FOR RESCISSION – Page 14

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

26

1    • "Real estate agents and brokers exerted similar pressure 56% of the
2       time."

3    • "96% of respondents felt that appraisers in their market, when
        pressured to restate/adjust/change values, did modify property
4       values."

5    • 75% of respondents stated that their business was negatively
        affected when they refused to change a valuation.
6

7    • 68% of respondents lost the client when they refused to
        restate/adjust/change an appraised value.
8

9    • 45% of respondents did not get paid for their appraisals when they
        refused to restate/adjust/change an appraised value.

10       41.     It is very probable that, because there was upward bias in appraisals

11   throughout the mortgage loan industry during the time period before this securitization, a

12   significant number of mortgage loans in the collateral pool of this securitization had

13   upwardly biased appraisals.

14

15            b.      **Evidence of untrue or misleading statements about the LTVs and
                      CLTVs of the mortgage loans in the collateral pool of this
16                    securitization specifically**

17       42.     Since the date of this securitization, 36 of the 1,257 mortgage loans in the

18   collateral pool have been foreclosed upon. Those 36 properties were sold for a total of

19   approximately $10,069,016 in foreclosure. The total value ascribed to those same properties

20   in the LTV and CLTV data reported in the prospectus supplement and other documents

21   Countrywide Securities and CWALT sent to Seattle Bank was $17,793,000. Thus, those

22   properties were sold for 56.6% of the value ascribed to them, a difference of 43.4%. This

23   large difference is evidence that the values ascribed to those properties, and to all properties

24   in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and

25   other documents Countrywide Securities and CWALT sent to Seattle Bank were too high,

26

COMPLAINT FOR RESCISSION – Page 15

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

        **c.**      **Undisclosed "silent second" mortgages**

43.     During the time before this securitization, so-called "silent second" mortgages were pervasive in the nonconforming mortgage loan industry. A silent second is a second mortgage loan made by someone other than the first mortgage lender that is not disclosed to the first mortgage lender at the time of the first mortgage loan. (Often, a silent second was made by the seller of a property to enable the buyer to make the down payment required by the first mortgage lender.) Two economists at the Federal Reserve Bank of New York studied millions of nonconforming first mortgage loans securitized starting in 2005 and found silent seconds on the properties that secured 25% or more of them.

44.     It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time

COMPLAINT FOR RESCISSION – Page 16

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

28

period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

**B.** **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.** **The materiality of occupancy status**

    45.    Residential real estate is usually divided into primary residences, second homes, and investment properties. Mortgages on primary residences are less risky than mortgages on second homes and investment properties.

    46.    Occupancy status (that is, whether the property that secures a mortgage is to be the primary residence of the borrower, a second home, or an investment property) is an important measure of the risk of a mortgage loan, and the percentage of loans in the collateral pool of a securitization that are secured by mortgages on primary residences rather than on second homes or investment properties is an important measure of the risk of certificates sold in that securitization. Other things being equal, the higher the percentage of loans secured by primary residences, the lower the risk of the certificates. A reasonable investor considers occupancy status important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the percentage of the mortgage loans in the collateral pool of a securitization that are secured by mortgages on primary residences have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 17

**Ill**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**2.    Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

47.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In Annex A of the prospectus supplement described in paragraph 33, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave eight other items of information about them. CWALT 2007-OH3 Pros. Sup. A-6.

b.    In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 81.68% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 12.99% were secured by an "Investment Property," and 5.33% were secured by a "Secondary Residence." CWALT 2007-OH3 Pros. Sup. A-6.

48.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that

COMPLAINT FOR RESCISSION – Page 18

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

49.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

50.    Because they are less risky than other mortgage loans, mortgage loans on primary residences usually have more favorable terms, including lower interest rates, than mortgage loans on second homes and investment properties. Applicants for loans on second homes and investment properties therefore have an incentive to state that the property will be their primary residence even when it will not.

51.    This type of "occupancy fraud" was widespread throughout the nonconforming mortgage loan industry during the time before this securitization. BasePoint Analytics LLC, a consultant about fraud, studied millions of mortgage loans for evidence of fraud. BasePoint concluded that occupancy fraud comprised 20% of all mortgage fraud. In November 2007, Fitch conducted a detailed review of files on 45 subprime mortgage loans made in 2006 that had defaulted early in their terms. Fitch found that, in fully two-thirds of the loans, the borrowers had stated that the properties were to be owner-occupied, but in fact, they were not.

52.    It is very probable that, because there was widespread occupancy fraud throughout the nonconforming mortgage loan industry during the time period before this

COMPLAINT FOR RESCISSION – Page 19

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.     Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

    **1.     The materiality of FICO scores**

    53.     A credit score (also called a FICO score after Fair Isaac Corporation, which devised the score) is a measure of a person's creditworthiness. The highest score is 850, the lowest 300. The score is calculated from such factors as the length of a person's credit history, the number of times a person has been late in paying bills, the amount of credit a person has available, etc. The higher a borrower's FICO score, the lower the risk that that borrower will default on payment of his or her mortgage.

    54.     A borrower's FICO score is an important measure of the risk of a mortgage loan to that borrower, and the FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization are likewise an important measure of the risk of certificates sold in that securitization. A reasonable investor considers FICO scores important to the decision whether to purchase a certificate in a securitization of mortgage loans. Differences in the weighted average FICO scores of borrowers of the mortgage loans in the collateral pool of a securitization have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

COMPLAINT FOR RESCISSION – Page 20

**ııı**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

32

2. **Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

55. In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a. The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 620 to 824 with a weighted average of 724. CWALT 2007-OH3 Pros. Sup. S-2.

b. The number of mortgage loans with unknown FICO scores was two. This was 0.26% of the mortgage loans. CWALT 2007-OH3 Pros. Sup. S-2.

c. In Annex A of the prospectus supplement described in paragraph 33, Countrywide Securities and CWALT presented 23 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 43. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO credit scores of the loans in the collateral pool. CWALT 2007-OH3 Pros. Sup. A-1 to A-10.

d. "As of the cut-off date, the weighted average FICO Credit Score of the borrowers related to the Mortgage Loans was approximately 724." CWALT 2007-OH3 Pros. Sup. A-7.

56. These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

COMPLAINT FOR RESCISSION – Page 21

57.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

3.    **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

58.    A person's credit or FICO score is an important factor in his or her eligibility for a mortgage loan. In order to make themselves eligible for loans they would not otherwise be eligible for (or for larger loans than they would otherwise be eligible for), many borrowers used a practice known as "tradeline renting." As Fair Isaac itself described this practice in testimony to Congress, "customers with good FICO scores . . . add strangers with poor FICO scores to their credit card accounts as authorized users." (The strangers do not actually have the use of the account.) By this process, a person can raise his or her FICO score by as much as 75 points. By repeating the process, a person can raise his or her FICO score by as much as 200 points. Tradeline renting was available from "credit repair" sites on the Internet, which charged as much as $2,000 for the service. Tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization.

59.    In its review of subprime mortgage loans in November 2007, Fitch found that the FICO scores of 16% of the borrowers that it studied reflected tradeline renting.

60.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many

COMPLAINT FOR RESCISSION – Page 22

|||
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.   Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

61.     Seattle Bank repeats paragraphs 27 through 60.

62.     Investors in mortgage-backed securities, including Seattle Bank, rely extensively on certain characteristics of the mortgage loans in the collateral pool of a securitization to predict the performance of those loans and thereby to determine the risk both of those loans and of the certificates sold in that securitization. Reasonable investors consider information about these characteristics important to the decision whether to purchase a certificate in a securitization of mortgage loans. Among the most important of these characteristics are LTV and FICO score.

63.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

64.     During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

COMPLAINT FOR RESCISSION – Page 23

**lll**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

35

65.     This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates (including CWALT). The lines in Figure 1 show, for all nonconforming loans securitized by Countrywide Securities or its affiliates, that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans securitized by Countrywide Securities or its affiliates deteriorated steadily during the time before this securitization. The bars in Figure 1 show early payment defaults, that is, the percent of loans (by outstanding principal balance) that became 60 or more days delinquent within six months after they were made. An early payment default is usually the result of poor credit quality and poor underwriting of the loan when it was made, rather than of macroeconomic factors after it was made. As Figure 1 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION -- Page 24

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888





Figure 1: Percent of Loans Securitized by Countrywide Securities or its Affiliates 60+ Delinquent Six Months After Origination, by Quarter of Origination

66.    Figure 2 further illustrates the undisclosed deterioration in the credit quality of nonconforming loans securitized by Countrywide Securities or its affiliates, which had nearly constant weighted-average reported LTVs and FICO scores. Figure 2 shows, for each month after origination, the percentage (by outstanding principal balance) of nonconforming mortgage loans made in each of 2004, 2005, 2006, and 2007 and securitized by Countrywide Securities or its affiliates that were 60 or more days delinquent. As Figure 2 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 25

1
2
3
4
5
6
7
8
9
10
11
12
13



14   67.   This deterioration in the credit quality of mortgage loans with ostensibly

15   similar credit characteristics was true not only of nonconforming mortgage loans securitized

16   by Countrywide Securities but also of nonconforming mortgage loans originated by

17   Countrywide Home Loans, Inc., which originated 84.7% of the mortgage loans in this

18   securitization. The lines in Figure 3 show, for all nonconforming loans originated by

19   Countrywide Home Loans, Inc., that the weighted-average reported LTV and weighted-

20   average reported FICO score were nearly constant. Despite the stability of these important

21   credit characteristics, however, the actual credit quality of nonconforming loans originated

22   by Countrywide Home Loans, Inc. deteriorated steadily during the time before this

23   securitization. Like the bars in Figure 1, the bars in Figure 3 show early payment defaults.

24   As Figure 3 makes clear, the credit quality of the loans originated by Countrywide Home

25
26

COMPLAINT FOR RESCISSION – Page 26

III
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

38

Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.



68.     Figure 4 further illustrates the undisclosed deterioration in the credit quality of nonconforming loans originated by Countrywide Home Loans, Inc., which had nearly constant weighted-average reported LTVs and FICO scores. Figure 4 shows, for each month after origination, the percentage (by outstanding principal balance) of nonconforming mortgage loans originated by Countrywide Home Loans, Inc. in each of 2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 4 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 27

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888



Figure 4: Percent of Loans Originated by Countrywide Home Loans, Inc. 60+ Delinquent in Each Month After Origination, by Year of Origination

69.     All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

70.     By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 28

iH
YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

E.   **Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

1.   **The materiality of underwriting guidelines and the extent of compliance with them**

71.   Most or all originators of nonconforming mortgage loans had written guidelines by which they evaluated applications for loans. An originator's guidelines, and the extent to which the originator complies with them, are important indicators of the risk of mortgage loans made by that originator and of certificates sold in a securitization in which mortgage loans made by that originator are a substantial part of the collateral pool. A reasonable investor considers the underwriting guidelines of each originator of a substantial part of the mortgage loans in the collateral pool of a securitization, and the extent to which the originator complied with its guidelines, important to the decision whether to purchase a certificate in that securitization. Differences in those guidelines or in the extent to which an originator complied with them have a significant effect on the risk of each certificate sold in that securitization and thus are important to the decision of a reasonable investor whether to purchase any such certificate.

2.   **Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

72.   On pages S-42 through S-47 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 84.7% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

COMPLAINT FOR RESCISSION – Page 29

73. One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-OH3 Pros. Sup. S-43.

74. On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

75. By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH3 that they offered and sold to Seattle Bank.

**3. Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

76. During the time before this securitization, most or all originators of nonconforming mortgage loans relaxed their actual lending standards, notwithstanding their stated underwriting guidelines. Based on an empirical study of subprime loan applications, economists at the International Monetary Fund found "robust evidence that lending standards eased in the subprime mortgage industry during the fast expansion of the past few years [i.e. 2005-2007]." This general relaxation of lending standards included: (a) frequent,

COMPLAINT FOR RESCISSION – Page 30

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

and increasingly frequent, exceptions to stated underwriting guidelines; (b) frequent, and increasingly frequent, exceptions to underwriting guidelines when no compensating factor was present; (c) wholesale, rather than case-by-case, exceptions to underwriting guidelines; and (d) frequent, and increasingly frequent, failure to follow quality-assurance practices intended to detect and prevent fraud.

77.     The general relaxation of lending standards that took place before the time of this securitization in most or all originators of nonconforming mortgage loans took place specifically at Countrywide Home Loans, Inc., the originator of 84.7% of the mortgage loans in the collateral pool of this securitization. A federal investigation into Countrywide's lending practices revealed that "loan documents were often marked by dubious or erroneous information." One former Countrywide manager, who pleaded guilty to two counts of wire-fraud, said that "If you had a pulse, [Countrywide] gave you a loan," and that the practice of pushing through loans with false information was common. Another account manager claimed that Countrywide was "infested" with employees who violated company standards to underwrite loans. For instance, one borrower, a personal trainer who made less than $20,000 per year, claimed that her Countrywide loan application listed her income as more than four times that amount, and qualified her for a mortgage where the payment was $500 more than her monthly income.

78.     During the time before this securitization, when Countrywide Securities or its affiliates (including CWALT) securitized a pool of loans, a small percentage of the loans to be placed in the pool were audited to verify that the information in the loan files complied with the underwriting guidelines. If a loan failed the audit (for example, documents were missing from the loan file), then it was dropped from the pool. On

COMPLAINT FOR RESCISSION – Page 31

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  information and belief, Countrywide Securities and its affiliates had a "three-strikes"

2  policy, that is, unless the rejected loan had been selected for audit and rejected three times,

3  it would simply be placed into a different securitization. Because only a small percentage of

4  the loans in each pool were audited, it is highly unlikely that a loan that had been rejected

5  and placed into a different securitization would again be selected for an audit. Thus, it is

6  

7  likely that this collateral pool contained loans that Countrywide Securities knew failed to

8  comply with the underwriting guidelines.

9  

**F.    Claim for Rescission**

10  

11  79.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

12  the consideration that it paid for this certificate, $79,273,133, plus interest of 8% per annum

13  from August 6, 2007, to the date on which it recovers the $79, 273,133, plus its costs and

14  the reasonable fees of its attorneys in this action, minus the amount of income it has

15  received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the

16  certificate before entry of judgment.

17  

18  **VI. SECOND CLAIM FOR RELIEF**

19  

| | |
|---|---|
| *Certificate*: | One certificate in tranche A-1-A of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH2 |
| *Date of Purchase*: | June 29, 2007 |
| *Consideration Paid*: | $150,000,000 |
| *Underwriter*: | Countrywide Securities |
| *Depositor/Issuer*: | CWALT |
| *Controlling Person of Depositor/Issuer*: | Countrywide Financial Corporation |

80.    Seattle Bank repeats paragraphs 1 through 20.

COMPLAINT FOR RESCISSION – Page 32

44

81.     Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2007-OH2 was a securitization in June 2007 of approximately 2,348 mortgage loans, in one group, with an aggregate principal balance of approximately $1,003,671,995. The mortgage loans were originated by Countrywide Home Loans, Inc., Flagstar Bank, FSB, and various other undisclosed originators. Countrywide Home Loans, Inc. originated 72.66%, by aggregate principal balance, of the mortgage loans and Flagstar Bank, FSB, originated 23.18%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

82.     Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1-A, for which Seattle Bank paid $150,000,000 on June 29, 2007.

83.     In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[3] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

84.     Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

COMPLAINT FOR RESCISSION -- Page 33

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

45

85.     Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.      Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.      The materiality of LTVs and CLTVs**

86.     Seattle Bank repeats paragraphs 27 through 32.

**2.      Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization**

87.     In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs and CLTVs of the mortgage loans in the collateral pool in this securitization.

a.      The weighted average original LTV ratio of all the loans in the collateral pool was 74.52%. CWALT 2007-OH2 Pros. Sup. S-2.

b.      The percentage of loans with an original LTV greater than 80% was 6.92%. CWALT 2007-OH2 Pros. Sup. S-2.

c.      "No Mortgage Loan had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2007-OH2 Pros. Sup. S-38.

d.      In Annex A of the prospectus supplement ("The Mortgage Pool"), Countrywide Securities and CWALT presented tables of statistics about the mortgage loans

---

[3] The prospectus supplement for CWALT 2007-OH2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000114420407035146/v079879_424b5.htm.

COMPLAINT FOR RESCISSION – Page 34

YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" and the "Weighted Average Combined Loan-to-Value Ratio" of the loans in each category. There were 23 such tables in Annex A for all loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 45. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs and CLTVs of the loans in the collateral pool. CWALT 2007-OH2 Pros. Sup. A-1 to A-10.

      e.    "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 74.52%." CWALT 2007-OH2 Pros. Sup. A-4.

      88.    These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

COMPLAINT FOR RESCISSION – Page 35

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

89.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

3.    **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.    **Upward bias in appraisals**

90.    Seattle Bank repeats paragraphs 36 through 40.

91.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

b.    **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

92.    Since the date of this securitization, 64 of the 2,348 mortgage loans in the collateral pool have been foreclosed upon. Those 64 properties were sold for a total of approximately $21,717,451 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $37,078,692. Thus, those properties were sold for 58.6% of the value ascribed to them, a difference of 41.4%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high,

COMPLAINT FOR RESCISSION – Page 36

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

        **c.**    **Undisclosed "silent second" mortgages**

93.     Seattle Bank repeats paragraph 43.

94.     It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

**B.**    **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.**    **The materiality of occupancy status**

95.     Seattle Bank repeats paragraphs 45 through 46.

COMPLAINT FOR RESCISSION – Page 37

**YARMUTH WILSDON CALFO**
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**2.    Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

96.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.    In Annex A of the prospectus supplement described in paragraph 87, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave eight other items of information about them. CWALT 2007-OH2 Pros. Sup. A-6.

b.    In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 84.46% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 11.12% were secured by an "Investment Property," and 4.42% were secured by a "Secondary Residence." CWALT 2007-OH2 Pros. Sup. A-6.

97.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that

COMPLAINT FOR RESCISSION – Page 38

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

98.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

99.    Seattle Bank repeats paragraphs 50 through 51.

100.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.    Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of FICO scores**

101.    Seattle Bank repeats paragraphs 53 through 54.

**2.    Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

102. In the prospe    ctus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

COMPLAINT FOR RESCISSION – Page 39

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

a.      The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 499 to 822 with a weighted average of 724. CWALT 2007-OH2 Pros. Sup. S-2.

b.      No mortgage loan had an unknown FICO score. CWALT 2007-OH2 Pros. Sup. S-2.

c.      In Annex A of the prospectus supplement described in paragraph 87, Countrywide Securities and CWALT presented 23 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in the collateral pool. Thus, in Annex A, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in the collateral pool. CWALT 2007-OH2 Pros. Sup. A-1 to A-10.

d.      "As of the cut-off date, the weighted average FICO Credit Score of the borrowers related to the Mortgage Loans was approximately 724." CWALT 2007-OH2 Pros. Sup. A-7.

103.  These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

104.   By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 40

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

3. **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

105. Seattle Bank repeats paragraphs 58 through 59.

106. It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

D. **Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

107. Seattle Bank repeats paragraphs 86 through 106.

108. Seattle Bank repeats paragraph 62.

109. In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

110. During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

COMPLAINT FOR RESCISSION – Page 41

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

111.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

112.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated 72.66% of the loans in the collateral pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

113.    All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO

COMPLAINT FOR RESCISSION – Page 42

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

score, yet performed worse if the loans were made in 2007 than if they were made in 2006, worse if made in 2006 than if made in 2005, etc.

114.   By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

**E.   Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.   The materiality of underwriting guidelines and the extent of compliance with them**

115.   Seattle Bank repeats paragraph 71.

    **2.   Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

116.   On pages S-42 through S-47 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 72.66% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

117.One   of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2007-OH2 Pros. Sup. S-43.

118.   On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and

COMPLAINT FOR RESCISSION – Page 43

**III**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

119. By   these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2007-OH2 that they offered and sold to Seattle Bank.

> **3.** **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

120. Seattle Bank repeats paragraphs 76 through 78.

121. Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

**F.   Claim for Rescission**

122. Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $150,000,000, plus interest of 8% per annum from June 29, 2007, to the date on which it recovers the $150,000,000, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 44

YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## VII. THIRD CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate*: | One certificate in tranche A-1 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA19 |
| *Date of Purchase*: | November 30, 2006 |
| *Consideration Paid*: | $75,000,000 |
| *Underwriter*: | Countrywide Securities |
| *Depositor/Issuer*: | CWALT |
| *Controlling Person of Depositor/Issuer*: | Countrywide Financial Corporation |

123.    Seattle Bank repeats paragraphs 1 through 20.

124.    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA19 was a securitization in November 2006 of approximately 2,415 mortgage loans, in one group, with an aggregate principal balance of approximately $921,320,354. The mortgage loans were originated by Countrywide Home Loans, Inc. and various other undisclosed originators. Countrywide Home Loans, Inc. originated 87.2% by aggregate principal balance of the mortgage loans in the collateral pool. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

125.    Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $75,000,000 on November 30, 2006.

126.In connec    tion with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC

COMPLAINT FOR RESCISSION – Page 45

**⫼**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800    F 206.516.3888

for this securitization,[4] drafts of some of the statistical tables to be included in the

prospectus supplement, and a computer model of the financial structure of the

securitization. In these documents, Countrywide Securities and CWALT made statements

of material fact about the certificate that they offered and sold to Seattle Bank.

127.Seattl    e Bank relied on the statements by Countrywide Securities and

CWALT in these documents in deciding to purchase this certificate. It was reasonable for

Seattle Bank to rely on the statements in these documents.

128.Many      of the statements of material fact that Countrywide Securities and

CWALT made in these documents were untrue or misleading. These untrue or misleading

statements included the following.

**A.    Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) and
        Combined Loan-to-Value Ratios (CLTVs) of the Mortgage Loans in the
        Collateral Pool of this Securitization.**

**1.      The materiality of LTVs and CLTVs**

129.    Seattle Bank repeats paragraphs 27 through 32.

**2.      Untrue or misleading statements by Countrywide Securities and
          CWALT about the LTVs and CLTVs of the mortgage loans in the
          collateral pool of this securitization**

130.    In the prospectus supplement and other documents they sent to Seattle Bank,

Countrywide Securities and CWALT made the following statements about the LTVs and

CLTVs of the mortgage loans in the collateral pool in this securitization.

---

[4] The prospectus supplement for CWALT 2006-OA19 was filed with the SEC and is available at
http://www.sec.gov/Archives/edgar/data/1269518/000114420406051130/v059459_424b5.htm.

COMPLAINT FOR RESCISSION – Page 46

YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1            a.      The weighted average original LTV ratio of all the loans in the

2    collateral pool was 75.41%. CWALT 2006-OA19 Pros. Sup. S-5.

3            b.      The percentage of loans with an original LTV ratio greater than 80%

4    was 9.13%. CWALT 2006-OA19 Pros. Sup. S-5.

5

6            c.      "No Initial Mortgage Loan had a Loan-to-Value Ratio at origination

7    of more than 95.00%." CWALT 2006-OA19 Pros. Sup. S-36.

8            d.      In "The Mortgage Pool" section of the prospectus supplement,

9    Countrywide Securities and CWALT presented tables of statistics about the mortgage loans

10   in the collateral pool. Each table focused on a certain characteristic of the loans (for

11   example, current principal balances) and divided the loans into categories based on that

12   characteristic (for example, loans with current principal balances of less than $50,000,

13   $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various

14   data about the loans in each category. Among these data was the "Weighted Average

15   Original Loan-to-Value Ratio" of the loans in each category. There were 22 such tables in

16   "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number

17   of categories into which the loans are divided ranged from two to 45. Thus, in this section,

18   Countrywide Securities and CWALT made hundreds of statements about the weighted

19   average original LTVs and CLTVs of the loans in the collateral pool. CWALT 2006-OA19

20   Pros. Sup. S-39 to S-53.

21

22           e.      "As of the initial cut-off date, the weighted average original Loan-to-

23   Value Ratio of the Initial Mortgage Loans was approximately 75.41%." CWALT 2006-

24   OA19 Pros. Sup. S-43.

25

26

COMPLAINT FOR RESCISSION – Page 47

**‖‖‖**
YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

f.     "The Mortgage Pool" section of the prospectus supplement presented a table entitled "Combined Loan-to-Value Ratios" for all the loans in the collateral pool. In this table, Countrywide Securities and CWALT divided the table into 11 different categories of CLTV (for example, 0.01% to 50 %, 50.01% to 55%, 55.01% to 60%, etc.). For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA19 Pros. Sup. S-44.

131.    These statements were untrue or misleading because (i) the stated LTVs and CLTVs of a significant number of those mortgage loans were lower than the actual LTVs and CLTVs; (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs and CLTVs based on those appraisals were lower than the true LTVs and CLTVs of those mortgage loans; or (iii) the stated LTVs and CLTVs did not reflect second mortgages on a significant number of the properties that secured the mortgage loans in the collateral pool.

132.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

3.    **Basis of the allegations above that these statements by about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

a.    **Upward bias in appraisals**

133.    Seattle Bank repeats paragraphs 36 through 40.

134.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a

COMPLAINT FOR RESCISSION – Page 48

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

          **b.**    **Evidence of untrue or misleading statements about the LTVs and CLTVs of the mortgage loans in the collateral pool of this securitization specifically**

135.    Since the date of this securitization, 228 of the 2,415 mortgage loans in the collateral pool have been foreclosed upon. Those 228 properties were sold for a total of approximately $63,948,130 in foreclosure. The total value ascribed to those same properties in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $113,389,587. Thus, those properties were sold for 56.4% of the value ascribed to them, a difference of 43.6%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV and CLTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank were too high, the resulting LTVs and CLTVs were too low, and thus that the statements in the prospectus supplement and other documents sent to Seattle Bank about the LTVs and CLTVs were untrue or misleading. The difference cannot be explained by the declines in house prices in the areas in which those properties were located (even after taking account of the fact that properties in foreclosure may sometimes sell for less than their fair market value). Analysis of data in an industry-standard database of securitized mortgage loans shows that the differences between the values ascribed to these properties and the prices at which the properties were sold in foreclosure are significantly greater than the declines in house prices in the same geographical areas over the same periods (that is, between the making of each mortgage loan and the corresponding foreclosure sale).

COMPLAINT FOR RESCISSION – Page 49

YARMUTH WILSON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

c.      Undisclosed "silent second" mortgages

136.    Seattle Bank repeats paragraph 43.

137.    It is very probable that, because 25% or more of all securitized nonconforming first mortgage loans in the United States had silent seconds during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had silent seconds.

B.      **Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

1.      **The materiality of occupancy status**

138.    Seattle Bank repeats paragraphs 45 through 46.

2.      **Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

139.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.      In "The Mortgage Pool" section of the prospectus supplement described in paragraph 130, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Owner Occupied," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA19 Pros. Sup. S-46.

COMPLAINT FOR RESCISSION – Page 50

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

b.      In the "Occupancy Types" table, Countrywide Securities and

CWALT stated that 83.47% of the mortgage loans in the collateral pool, by aggregate

principal balance outstanding, were secured by a "Owner Occupied" property, 10.51% were

secured by an "Investment Property," and 6.03% were secured by a "Secondary

Residence." CWALT 2006-OA19 Pros. Sup. S-46.

140.    These statements were untrue or misleading because (i) the stated number of

mortgage loans in the category "Owner Occupied" was higher than the actual number of

loans in that category; (ii) the stated number of mortgage loans in the category "Investment

Property" was lower than the actual number of loans in that category; (iii) the stated number

of mortgage loans in the category "Secondary Residence" was lower than the actual number

of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that

the occupancy status of a significant number of the properties that secured the mortgage

loans in the collateral pool was misstated because of fraud.

141.    By these untrue and misleading statements, Countrywide Securities and

CWALT materially understated the risk of the certificate issued by Alternative Loan Trust

2006-OA19 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide
Securities and CWALT about the occupancy status of the properties
that secured the mortgage loans in the collateral pool of this
securitization were untrue or misleading**

142.    Seattle Bank repeats paragraphs 50 through 51.

143.    It is very probable that, because there was widespread occupancy fraud

throughout the mortgage loan industry during the time before this securitization, a

significant number of the applicants for mortgage loans in the collateral pool of this

COMPLAINT FOR RESCISSION – Page 51

III
YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

**C.    Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

    **1.    The materiality of FICO scores**

144.    Seattle Bank repeats paragraphs 53 through 54.

    **2.    Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

145.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

    a.    The FICO scores of the borrowers of the mortgage loans in the collateral pool ranged from 597 to 823 with a weighted average of 706. CWALT 2006-OA19 Pros. Sup. S-5.

    b.    The number of mortgage loans with unknown FICO scores was six. This was 0.11% of the mortgage loans. CWALT 2006-OA19 Pros. Sup. S-5.

    c.    In "The Mortgage Pool" section of the prospectus supplement described in paragraph 130, Countrywide Securities and CWALT presented 22 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from two to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of

COMPLAINT FOR RESCISSION – Page 52

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

64

statements about the weighted average FICO scores of the loans in the collateral pool.

CWALT 2006-OA19 Pros. Sup. S-39 to S-53.

     d.   "As of the initial cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Initial Mortgage Loans was approximately 706."

CWALT 2006-OA19 Pros. Sup. S-48.

146.   These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

147.   By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

    **3.**    **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

148.   Seattle Bank repeats paragraphs 58 through 59.

149.   It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their FICO scores by tradeline renting.

**D.**    **Failure to Disclose the Substantial Deterioration of LTV and FICO score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

150.   Seattle Bank repeats paragraphs 129 through 149.

151.   Seattle Bank repeats paragraph 62.

COMPLAINT FOR RESCISSION – Page 53

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

65

152.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made statements about the LTVs and FICO scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

153.    During the time before this securitization, the power of LTV and FICO score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

154.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

155.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also in particular of nonconforming loans originated by Countrywide Home Loans, Inc., which originated 87.2% of the mortgage loans in the collateral pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit

COMPLAINT FOR RESCISSION – Page 54

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

156.    All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

157.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

E.    **Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

1.    **The materiality of underwriting guidelines and the extent of compliance with them**

158.    Seattle Bank repeats paragraph 71.

COMPLAINT FOR RESCISSION – Page 55

**iii**
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

2.   **Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

159. On pages S-57 through S-62 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 87.2% of the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

160.   One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-OA19 Pros. Sup. S-58.

161.   On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

162.   By these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA19 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 56

YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

3. **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines**

163. Seattle Bank repeats paragraphs 76 through 78.

164. Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

F. **Claim for Rescission**

165. Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $75,000,000, plus interest of 8% per annum from November 30, 2006, to the date on which it recovers the $75,000,000, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

## VIII. FOURTH CLAIM FOR RELIEF

| | |
|---|---|
| *Certificate:* | One certificate in tranche 1A-2 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA6 |
| *Date of Purchase:* | April 28, 2006 |
| *Consideration Paid:* | $47,632,633 |
| *Underwriter:* | Countrywide Securities |
| *Depositor/Issuer:* | CWALT |
| *Controlling Person of Depositor/Issuer:* | Countrywide Financial Corporation |

166. Seattle Bank repeats paragraphs 1 through 20.

167. Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA6 was a securitization in May 2006 of approximately 2,689 mortgage loans, in two

COMPLAINT FOR RESCISSION – Page 57

groups, with an aggregate principal balance of approximately $1,043,247,104. The mortgage loans were originated by Countrywide Home Loans, Inc., MortgageIT, Inc., and other various undisclosed originators. Countrywide Home Loans, Inc. originated 85.18%, by aggregate principal balance, of the mortgage loans in Group 1 (from which Seattle Bank's certificate was to be paid), and MortgageIT, Inc. originated 12.97%. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

168.    Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche 1A-2, for which Seattle Bank paid $47,632,633 on April 28, 2006.

169.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[5] drafts of some of the statistical tables to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

170.    Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

---

[5] The prospectus supplement for CWALT 2006-OA6 was filed with the SEC and is available at
http://www.sec.gov/Archives/edgar/data/1269518/000089109206001278/e23764_424b5.txt.

COMPLAINT FOR RESCISSION – Page 58

171.   Many of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.   Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.   The materiality of LTVs**

172.   Seattle Bank repeats paragraphs 27 through 30.

    **2.   Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization**

173.   In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTVs of the mortgage loans in the collateral pool in this securitization.

    a.   The weighted average original LTV of the subset of loans in Group 1 (from which Seattle Bank's certificate was to be paid) was 72.86%. CWALT 2006-OA6 Pros. Sup. S-5.

    b.   The percentage of the subset of loans in Group 1 with an Original Loan-to-Value Ratio greater than 80% was 5.87%. CWALT 2006-OA6 Pros. Sup. S-5.

    c.   "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 100.00%." CWALT 2006-OA6 Pros. Sup. S-33.

    d.   In "The Mortgage Pool" section of the prospectus supplement, Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the

COMPLAINT FOR RESCISSION – Page 59

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each group. Among these data was the "Weighted Average Original Loan-to-Value Ratio" of the loans in each category. There were 20 such tables in "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from two to 45. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs of the loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49.

e.      "The Mortgage Pool" section of the prospectus supplement also presented similar tables of statistics about the subset of loans in Group 1. In these tables, Countrywide Securities and CWALT similarly made hundreds of statements about the weighted average LTVs of the loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-50 to S-60.

f.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 72.87%." CWALT 2006-OA6 Pros. Sup. S-41.

g.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans in Loan Group 1 was approximately 72.86%." CWALT 2006-OA6 Pros. Sup. S-53.

174.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant

COMPLAINT FOR RESCISSION – Page 60

number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

175.     By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

**3.     Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

**a.     Upward bias in appraisals**

176.     Seattle Bank repeats paragraphs 36 through 40.

177.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**b.     Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically**

178.     Since the date of this securitization, 191 of the 2,689 mortgage loans in the collateral pool have been foreclosed upon. Those 191 properties were sold for a total of approximately $62,156,245 in foreclosure. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $105,848,400. Thus, those properties were sold for 58.7% of the value ascribed to them, a difference of 41.3%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral

COMPLAINT FOR RESCISSION – Page 61

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

pool, in the LTV data reported in the prospectus supplement and other documents

Countrywide Securities and CWALT sent to Seattle Bank were too high, the resulting

LTVs were too low, and thus that the statements in the prospectus supplement and other

documents sent to Seattle Bank about the LTVs were untrue or misleading. The difference

cannot be explained by the declines in house prices in the areas in which those properties

were located (even after taking account of the fact that properties in foreclosure may

sometimes sell for less than their fair market value). Analysis of data in an industry-

standard database of securitized mortgage loans shows that the differences between the

values ascribed to these properties and the prices at which the properties were sold in

foreclosure are significantly greater than the declines in house prices in the same

geographical areas over the same periods (that is, between the making of each mortgage

loan and the corresponding foreclosure sale).

**B.      Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

    **1.      The materiality of occupancy status**

    179.   Seattle Bank repeats paragraphs 45 through 46.

    **2.      Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

    180.   In the prospectus supplement and other documents they sent to Seattle Bank,

Countrywide Securities and CWALT made the following statements about the occupancy

status of the properties that secured the mortgage loans in the collateral pool of this

securitization.

COMPLAINT FOR RESCISSION – Page 62

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

a.     In "The Mortgage Pool" section of the prospectus supplement described in paragraph 173, Countrywide Securities and CWALT presented a table entitled "Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA6 Pros. Sup. S-43.

b.     In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 80.87% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 11.65% were secured by an "Investment Property," and 7.48% were secured by a "Secondary Residence." CWALT 2006-OA6 Pros. Sup. S-43.

c.     "The Mortgage Pool" section of the prospectus supplement also presented a similar table divided into three categories of occupancy status for the subset of loans in Group 1. In this table, Countrywide Securities and CWALT stated that 83.07% of the mortgage loans in Group 1, by aggregate principal balance outstanding, were secured by an "Owner Occupied" property, 10.00% were secured by an "Investment Property," and 6.92% were secured by a "Secondary Residence." CWALT 2006-OA6 Pros. Sup. S-55.

181.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" or "Owner Occupied" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and

COMPLAINT FOR RESCISSION – Page 63

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

CWALT omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

182.   By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

3.   **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

183.   Seattle Bank repeats paragraphs 50 through 51.

184.   It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

C.   **Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

1.   **The materiality of FICO scores**

185.   Seattle Bank repeats paragraphs 53 through 54.

2.   **Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

186.   In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

COMPLAINT FOR RESCISSION – Page 64

**lll**

YARMUTH WILSON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

a.  The FICO scores of the borrowers of the subset of loans in Group 1 ranged from 502 to 820 with a weighted average of 695. CWALT 2006-OA6 Pros. Sup. S-5.

b.  The number of loans in the subset of loans in Group 1 with unknown FICO scores was 33. This was 1.08% of the mortgage loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-5.

c.  In "The Mortgage Pool" section of the prospectus supplement described in paragraph 173, Countrywide Securities and CWALT presented 20 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from two to 45. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in the collateral pool. CWALT 2006-OA6 Pros. Sup. S-37 to S-49.

d.  "The Mortgage Pool" section of the prospectus supplement also presented similar tables of statistics about the subset of loans in Group 1. In those tables, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO scores of the loans in Group 1. CWALT 2006-OA6 Pros. Sup. S-50 to S-60.

e.  "As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Mortgage Loans was approximately 696." CWALT 2006-OA6 Pros. Sup. S-45.

COMPLAINT FOR RESCISSION – Page 65

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

f.      "As of the cut-off date, the weighted average FICO Credit Score of

the mortgagors related to the Mortgage Loans in Loan Group 1 was approximately 695."

CWALT 2006-OA6 Pros. Sup. S-57.

187.    These statements were misleading because Countrywide Securities and

CWALT omitted to state that a significant number of borrowers of the mortgage loans in

the collateral pool of this securitization inflated their FICO scores.

188.By     these misleading statements, Countrywide Securities and CWALT

materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6

that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

189.    Seattle Bank repeats paragraphs 58 through 59.

190.    It is very probable that, because tradeline renting was widespread throughout

the nonconforming mortgage loan industry during the time before this securitization, many

of the borrowers of the mortgage loans in the collateral pool of this securitization raised

their FICO scores by tradeline renting.

**D.      Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc. or MortgageIT, Inc.**

191.    Seattle Bank repeats paragraphs 172 through 190.

192.    Seattle Bank repeats paragraph 62.

193.    In the prospectus supplement and other documents they sent to Seattle Bank,

Countrywide Securities and CWALT made statements about the LTVs and FICO scores of

COMPLAINT FOR RESCISSION – Page 66

YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1  the mortgage loans in the collateral pool, as summarized above. All of those statements are

2  incorporated in this paragraph by reference.

3      194.    During the time before this securitization, the power of LTV and FICO score

4  to predict the performance of otherwise similar nonconforming mortgage loans deteriorated,

5  even after taking account of declines in house prices and other macroeconomic factors. Put

6  somewhat differently, loans that were very similar in these characteristics performed worse

7  if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than

8  if made in 2004, etc.

9

10     195.    This deterioration in the credit quality of mortgage loans with ostensibly

11  similar credit characteristics was true in particular of nonconforming loans securitized by

12  Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit

13  quality of the loans securitized by Countrywide Securities or its affiliates deteriorated

14  steadily from quarter to quarter from 2004 to 2007, even though those loans had very

15  similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit

16  quality of the loans securitized by Countrywide Securities or its affiliates deteriorated

17  steadily from 2004 to 2007, even though those loans had very similar reported LTVs and

18  FICO scores.

19     196.    This deterioration in the credit quality of mortgage loans with ostensibly

20  similar credit characteristics was true also in particular of nonconforming loans originated

21  by Countrywide Home Loans, Inc., which originated 85.18% of the subset of loans in

22  Group 1. As Figure 3 in paragraph 67 makes clear, the credit quality of the loans originated

23  by Countrywide Home Loans, Inc. deteriorated steadily from quarter to quarter from 2004

24  to 2007, even though those loans had very similar reported LTVs and FICO scores. As

COMPLAINT FOR RESCISSION – Page 67

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

Figure 4 in paragraph 68 makes clear, the credit quality of the loans originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

197.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true also of nonconforming mortgage loans originated by MortgageIT, Inc., which originated 12.97% of the subset of loans in Group 1. The lines in Figure 5 show, for all nonconforming loans originated by MortgageIT, Inc., that the weighted-average reported LTV and weighted-average reported FICO score were nearly constant. Despite the stability of these important credit characteristics, however, the actual credit quality of nonconforming loans originated by MortgageIT, Inc. deteriorated steadily during the time before this securitization. Like the bars in Figure 1, the bars in Figure 5 show early payment defaults. As Figure 5 makes clear, the credit quality of the loans originated by MortgageIT, Inc. deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 68

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888




Figure 5: Percent of Loans Originated by MortgageIT, Inc. 60+ Delinquent Six Months After Origination, by Quarter of Origination

198.    Figure 6 further illustrates the undisclosed deterioration in the credit quality of nonconforming loans originated by MortgageIT, Inc., which had nearly constant weighted-average reported LTVs and FICO scores. Figure 6 shows, for each month after origination, the percentage (by outstanding principal balance) of nonconforming mortgage loans originated by MortgageIT, Inc. in each of 2004, 2005, 2006, and 2007 that were 60 or more days delinquent. As Figure 6 makes clear, the credit quality of the loans originated by MortgageIT, Inc. deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and FICO scores.

COMPLAINT FOR RESCISSION – Page 69

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888



Figure 6: Percent of Loans Originated by MortgageIT, Inc. or its Affiliates 60+ Delinquent in Each Month After Origination, by Year of Origination

199.    All statements that Countrywide Securities and CWALT made about the LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that each of them securitized or that Countrywide Home Loans, Inc. or MortgageIT, Inc. originated were nearly constant in weighted average LTV and weighted average FICO score, yet performed worse if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than if made in 2004, etc.

200.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 70

E.    **Untrue or Misleading Statements about the Underwriting Guidelines of the Originators of the Mortgage Loans in the Collateral Pool of this Securitization**

    1.    **The materiality of underwriting guidelines and the extent of compliance with them**

    201.    Seattle Bank repeats paragraph 71.

    2.    **Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

    202.On pa    ges S-72 through S-78 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated 85.18% of the subset of loans in Group 1 of this securitization. All of those statements are incorporated here by reference.

    203.    One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-OA6 Pros. Sup. S-74.

    204.    On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

COMPLAINT FOR RESCISSION – Page 71

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

83

205.   By these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA6 that they offered and sold to Seattle Bank.

**3.   Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

206.   Seattle Bank repeats paragraphs 76 through 78.

207.   Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

**F.   Claim for Rescission**

208.   Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $47,632,633, plus interest of 8% per annum from April 28, 2006, to the date on which it recovers the $47,632,633, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 72

||| 
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

84

## IX. FIFTH CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate:* | One certificate in tranche A-1 of Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA2 |
| *Date of Purchase:* | March 30, 2006 |
| *Consideration Paid:* | $100,000,000 |
| *Underwriter:* | Countrywide Securities |
| *Depositor/Issuer:* | CWALT |
| *Controlling Person of Depositor/Issuer:* | Countrywide Financial Corporation |

209.    Seattle Bank repeats paragraphs 1 through 20.

210.    Alternative Loan Trust, Mortgage Pass-Through Certificates, Series 2006-OA2 was a securitization in March 2006 of approximately 4,107 mortgage loans, in one group, with an aggregate principal balance of approximately $1,750,428,288. The mortgage loans were originated by Countrywide Home Loans, Inc. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

211.    Countrywide Securities and CWALT offered and sold Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $100,000,000 on March 30, 2006.

212.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and CWALT sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[6] drafts of some of the statistical tables to be included in the

---

[6] The prospectus supplement for CWALT 2006-OA2 was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/1269518/000089109206000831/e23607_424b5.txt.

COMPLAINT FOR RESCISSION – Page 73

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and CWALT made statements of material fact about the certificate that they offered and sold to Seattle Bank.

213.    Seattle Bank relied on the statements by Countrywide Securities and CWALT in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

214. Many    of the statements of material fact that Countrywide Securities and CWALT made in these documents were untrue or misleading. These untrue or misleading statements included the following.

A.    **Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

1.    **The materiality of LTVs**

215.    Seattle Bank repeats paragraphs 27 through 30.

2.    **Untrue or misleading statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization**

216.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the LTV of the mortgage loans in the collateral pool in this securitization.

a.    The weighted average original LTV of all the loans in the collateral pool was 76.56%. CWALT 2006-OA2 Pros. Sup. S-4.

b.    The percentage of mortgage loans with an original LTV greater than 80% was 6.62%. CWALT 2006-OA2 Pros. Sup. S-4.

COMPLAINT FOR RESCISSION – Page 74

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

c.      "No Mortgage Loan will have had a Loan-to-Value Ratio at origination of more than 95.00%." CWALT 2006-OA2 Pros. Sup. S-33.

d.      In "The Mortgage Pool" section of the prospectus supplement, Countrywide Securities and CWALT presented tables of statistics about the mortgage loans in the collateral pool. Each table focused on a certain characteristic of the loans (for example, current principal balances) and divided the loans into categories based on that characteristic (for example, loans with current principal balances of $0.01 to $50,000, $50,000.01 to $100,000, $100,000.01 to $150,000, etc.). Each table then presented various data about the loans in each category. Among these data was the "Weighted Average Original Loan-to-Value Ratio" of the loans in each category. There were 20 such tables in "The Mortgage Pool" section for all loans in the collateral pool. In each table, the number of groups into which the loans are divided ranged from one to 48. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average original LTVs of the loans in the collateral pool. CWALT 2006-OA2 Pros. Sup. S-36 to S-47.

e.      "As of the cut-off date, the weighted average original Loan-to-Value Ratio of the Mortgage Loans was approximately 76.56%." CWALT 2006-OA2 Pros. Sup. S-40.

217.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and CWALT omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased

COMPLAINT FOR RESCISSION – Page 75

upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

218.     By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

### 3.     Basis of the allegations above that these statements by Countrywide Securities and CWALT about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading

#### a.     Upward bias in appraisals

219.     Seattle Bank repeats paragraphs 36 through 40.

220.     It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

#### b.     Evidence of untrue or misleading statements about the LTVs of the mortgage loans in the collateral pool of this securitization specifically

221.     Since the date of this securitization, 425 of the 4,107 mortgage loans in the collateral pool have been foreclosed upon. Those 425 properties were sold for a total of approximately $147,545,687 in foreclosure. The total value ascribed to those same properties in the LTV data reported in the prospectus supplement and other documents Countrywide Securities and CWALT sent to Seattle Bank was $240,255,248. Thus, those properties were sold for 61.4% of the value ascribed to them, a difference of 38.6%. This large difference is evidence that the values ascribed to those properties, and to all properties in the collateral pool, in the LTV data reported in the prospectus supplement and other

COMPLAINT FOR RESCISSION – Page 76

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

documents Countrywide Securities and CWALT sent to Seattle Bank were too high, the

resulting LTVs were too low, and thus that the statements in the prospectus supplement and

other documents sent to Seattle Bank about the LTVs were untrue or misleading. The

difference cannot be explained by the declines in house prices in the areas in which those

properties were located (even after taking account of the fact that properties in foreclosure

may sometimes sell for less than their fair market value). Analysis of data in an industry-

standard database of securitized mortgage loans shows that the differences between the

values ascribed to these properties and the prices at which the properties were sold in

foreclosure are significantly greater than the declines in house prices in the same

geographical areas over the same periods (that is, between the making of each mortgage

loan and the corresponding foreclosure sale).

**B.      Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

     **1.      The materiality of occupancy status**

     222.    Seattle Bank repeats paragraphs 45 through 46.

     **2.      Untrue or misleading statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

     223.    In the prospectus supplement and other documents they sent to Seattle Bank,

Countrywide Securities and CWALT made the following statements about the occupancy

status of the properties that secured the mortgage loans in the collateral pool of this

securitization.

     a.      In "The Mortgage Pool" section of the prospectus supplement

described in paragraph 216, Countrywide Securities and CWALT presented a table entitled

COMPLAINT FOR RESCISSION – Page 77

YARMUTH  WILSON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

"Occupancy Types." This table divided the loans in the collateral pool into the categories "Primary Residence," "Investment Property," and "Secondary Residence." For each category, the table stated the number of mortgage loans in that category and gave seven other items of information about them. CWALT 2006-OA2 Pros. Sup. S-42.

        b.     In the "Occupancy Types" table, Countrywide Securities and CWALT stated that 82.82% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary Residence," 12.48% were secured by an "Investment Property," and 4.70% were secured by a "Secondary Residence." CWALT 2006-OA2 Pros. Sup. S-42.

224.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary Residence" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Investment Property" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Secondary Residence" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and CWALT omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

225.    By these untrue and misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

COMPLAINT FOR RESCISSION – Page 78

‖‖
YARMUTH  WILSDON  CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

3.   **Basis of the allegations above that these statements by Countrywide Securities and CWALT about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

226.   Seattle Bank repeats paragraphs 50 through 51.

227.   It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

C.   **Misleading Statements about the FICO Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

1.   **The materiality of FICO scores**

228.   Seattle Bank repeats paragraphs 53 through 54.

2.   **Misleading statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

229.   In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and CWALT made the following statements about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.   The FICO scores of the borrowers of the loans in the collateral pool ranged from 585 to 817 with a weighted average of 695. CWALT 2006-OA2 Pros. Sup. S-4.

b.   The number of loans in the collateral pool with unknown FICO scores was 16. This was 0.30% of the mortgage loans in the collateral pool. CWALT 2006-OA2 Pros. Sup. S-4.

COMPLAINT FOR RESCISSION – Page 79

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

c.      In "The Mortgage Pool" section of the prospectus supplement described in paragraph 216, Countrywide Securities and CWALT presented 20 tables of statistics about the mortgage loans in the collateral pool. In each table, the number of categories into which the loans are divided ranged from one to 48. Among the data presented in each table was the "Weighted Average FICO Credit Score" of the loans in each category. Thus, in this section, Countrywide Securities and CWALT made hundreds of statements about the weighted average FICO credit scores of the loans in the collateral pool. CWALT 2006-OA2 Pros. Sup. S-36 to S-47.

d.      "As of the cut-off date, the weighted average FICO Credit Score of the mortgagors related to the Mortgage Loans was approximately 695." CWALT 2006-OA2 Pros. Sup. S-44.

230.    These statements were misleading because Countrywide Securities and CWALT omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their FICO scores.

231.    By these misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and CWALT about the FICO scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

232.    Seattle Bank repeats paragraphs 58 through 59.

233.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many

COMPLAINT FOR RESCISSION – Page 80

1    of the borrowers of the mortgage loans in the collateral pool of this securitization raised

2    their FICO scores by tradeline renting.

3

4    **D.**    **Failure to Disclose the Substantial Deterioration of LTV and FICO Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities or Originated by Countrywide Home Loans, Inc.**

5

6    234.    Seattle Bank repeats paragraphs 215 through 233.

7    235.    Seattle Bank repeats paragraph 62.

8    236.    In the prospectus supplement and other documents they sent to Seattle Bank,

9    Countrywide Securities and CWALT made statements about the LTVs and FICO scores of

10    the mortgage loans in the collateral pool, as summarized above. All of those statements are

11    incorporated in this paragraph by reference.

12

13    237.    During the time before this securitization, the power of LTV and FICO score

14    to predict the performance of otherwise similar nonconforming mortgage loans deteriorated,

15    even after taking account of declines in house prices and other macroeconomic factors. Put

16    somewhat differently, loans that were very similar in these characteristics performed worse

17    if the loans were made in 2006 than if they were made in 2005, worse if made in 2005 than

18    if made in 2004, etc.

19

20    238.    This deterioration in the credit quality of mortgage loans with ostensibly

21    similar credit characteristics was true in particular of nonconforming loans securitized by

22    Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit

23    quality of the loans securitized by Countrywide Securities or its affiliates deteriorated

24    steadily from quarter to quarter from 2004 to 2007, even though those loans had very

25    similar reported LTVs and FICO scores. As Figure 2 in paragraph 66 makes clear, the credit

26    quality of the loans securitized by Countrywide Securities or its affiliates deteriorated

*COMPLAINT FOR RESCISSION – Page 81*

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1   steadily from 2004 to 2007, even though those loans had very similar reported LTVs and

2   FICO scores.

3       239.    This deterioration in the credit quality of mortgage loans with ostensibly

4   similar credit characteristics was true also in particular of nonconforming loans originated

5   by Countrywide Home Loans, Inc., which originated the mortgage loans in the collateral

6   pool of this securitization. As Figure 3 in paragraph 67 makes clear, the credit quality of the

7   loans originated by Countrywide Home Loans, Inc. deteriorated steadily from quarter to

8   quarter from 2004 to 2007, even though those loans had very similar reported LTVs and

9   FICO scores. As Figure 4 in paragraph 68 makes clear, the credit quality of the loans

10  originated by Countrywide Home Loans, Inc. deteriorated steadily from 2004 to 2007, even

11  though those loans had very similar reported LTVs and FICO scores.

12
13      240.    All statements that Countrywide Securities and CWALT made about the

14  LTVs and FICO scores of the mortgage loans in the collateral pool of this securitization

15  were misleading because those defendants omitted to state that, in the time before this

16  securitization, loans that each of them securitized or that Countrywide Home Loans, Inc.

17  originated were nearly constant in weighted average LTV and weighted average FICO

18  score, yet performed worse if the loans were made in 2006 than if they were made in 2005,

19  worse if made in 2005 than if made in 2004, etc.

20
21      241.    By these misleading statements, Countrywide Securities and CWALT

22  materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2

23  that they offered and sold to Seattle Bank.

24

25

26

ill
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

E.     **Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

1.     **The materiality of underwriting guidelines and the extent of compliance with them**

242.   Seattle Bank repeats paragraph 71.

2.     **Untrue or misleading statements by Countrywide Securities and CWALT about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

243. On pa    ges S-49 through S-55 of the prospectus supplement, Countrywide Securities and CWALT made statements about the underwriting guidelines of Countrywide Home Loans, Inc., which originated the mortgage loans in the collateral pool of this securitization. All of those statements are incorporated here by reference.

244.   One of these statements was that: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if compensating factors are demonstrated by a prospective borrower." CWALT 2006-OA2 Pros. Sup. S-51.

245.   On information and belief, these statements were untrue or misleading because Countrywide Securities and CWALT omitted to state that: (a) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines; (b) Countrywide Home Loans, Inc. was making frequent, and increasingly frequent, exceptions to those underwriting guidelines when no compensating factor was present; and (c) Countrywide Home Loans, Inc. was failing frequently, and increasingly frequently, to follow quality-assurance practices intended to detect and prevent fraud.

COMPLAINT FOR RESCISSION – Page 83

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

246.   By these untrue or misleading statements, Countrywide Securities and CWALT materially understated the risk of the certificate issued by Alternative Loan Trust 2006-OA2 that they offered and sold to Seattle Bank.

**3.   Basis of the allegations above that these statements by Countrywide Securities and CWALT about the underwriting guidelines of the originators of the mortgage loans in the collateral pool of this securitization, and about the extent of their compliance with those guidelines, were untrue or misleading**

247.   Seattle Bank repeats paragraphs 76 through 78.

248.   Thus, it is likely that this collateral pool contained loans that Countrywide Securities knew failed to comply with the underwriting guidelines.

**F.   Claim for Rescission**

249.   Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover the consideration that it paid for this certificate, $100,000,000, plus interest of 8% per annum from March 30, 2006, to the date on which it recovers the $100,000,000, plus its costs and the reasonable fees of its attorneys in this action, less the amount of income it has received on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate before entry of judgment.

COMPLAINT FOR RESCISSION – Page 84

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

## X. SIXTH CLAIM FOR RELIEF

|  |  |
|---|---|
| *Certificate:* | One certificate in tranche A-1 of Merrill Lynch Mortgage Investors Trust, Mortgage Pass-Through Certificates, Series 2004-C |
| *Date of Purchase:* | September 1, 2004 |
| *Consideration Paid:* | $9,944,998 |
| *Underwriter:* | Countrywide Securities |
| *Depositor/Issuer:* | Merrill Lynch Mortgage Investors |
| *Controlling Person of Depositor/Issuer:* | Merrill Lynch Mortgage Capital Inc. |

250.    Seattle Bank repeats paragraphs 1 through 20.

251.    Merrill Lynch Mortgage Investors Trust, Mortgage Pass-Through Certificates, Series 2004-C was a securitization in June 2004 of approximately 2,310 mortgage loans, in three pools, with an aggregate principal balance of approximately $900,006,454. The mortgage loans were originated or acquired by Merrill Lynch Credit Corporation. The loans were "nonconforming," that is they did not conform to credit standards promulgated by Fannie Mae and Freddie Mac.

252.    Countrywide Securities and Merrill Lynch Mortgage Investors offered and sold to Seattle Bank a senior certificate in this securitization, in tranche A-1, for which Seattle Bank paid $9,944,998 on September 1, 2004.

253.    In connection with their offer and sale of this certificate to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors sent numerous documents to Seattle Bank at its office in King County. These documents included the prospectus supplement filed with the SEC for this securitization,[7] drafts of some of the statistical tables

---

[7] The prospectus supplement for MLCC 2004-C was filed with the SEC and is available at http://www.sec.gov/Archives/edgar/data/809940/000095012304007676/y98307e424b5.txt.

COMPLAINT FOR RESCISSION – Page 85

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

to be included in the prospectus supplement, and a computer model of the financial structure of the securitization. In these documents, Countrywide Securities and Merrill Lynch Mortgage Investors made statements of material fact about the certificate that they offered and sold to Seattle Bank.

254.    Seattle Bank relied on the statements by Countrywide Securities and Merrill Lynch Mortgage Investors in these documents in deciding to purchase this certificate. It was reasonable for Seattle Bank to rely on the statements in these documents.

255.    Many of the statements of material fact that Countrywide Securities and Merrill Lynch Mortgage Investors made in these documents were untrue or misleading. These untrue or misleading statements included the following.

**A.     Untrue or Misleading Statements about the Loan-to-Value Ratios (LTVs) of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.     The materiality of LTVs**

256.    Seattle Bank repeats paragraphs 27 through 30.

**2.     Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the LTVs of the mortgage loans in the collateral pool of this securitization**

257.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the LTVs of the mortgage loans in the collateral pool in this securitization.

a.     "None of the Mortgage Loans had a Loan-to-Value Ratio at origination of more than 100.00%." MLCC 2004-C Pros. Sup. S-15.

COMPLAINT FOR RESCISSION – Page 86

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

1    b.    "The weighted average Effective Loan-to-Value Ratio at origination

2  of the Mortgage Loans was approximately 66.33%, and no Mortgage Loan had an Effective

3  Loan-to-Value Ratio at origination exceeding 95.00%."[8] MLCC 2004-C Pros. Sup. S-18.

4    c.    In the section of the prospectus supplement entitled "Tabular

5  Characteristics of the Mortgage Loans," Countrywide Securities and Merrill Lynch

6  Mortgage Investors presented tables of statistics about the mortgage loans in the collateral

7  pool. MLCC 2004-C Pros. Sup. S-18 to S-51. Each table focused on a certain characteristic

8  of the loans (for example, cut-off date stated principal balance) and divided the loans into

9  categories based on that characteristic (for example, loans with stated principal balances as

10  of the cut-off date of $0.01 to $100,000, $100,000.01 to $200,000, $200,000.01 to

11  $300,000, etc.). Each table then presented various data about the loans in each category.

12  Each table presented various data about the loans in each category. One of the tables,

13  entitled "Original Loan-to-Value Ratios," divided the loans in the collateral pool into 13

14  categories of original LTV (for example, 0.01% to 10.00%, 10.01% to 20%, 20.01% to

15  30%, etc.). For each category, the table stated the number of mortgage loans, the aggregate

16  principal balance outstanding, and the percent of aggregate principal balance outstanding.

17  MLCC 2004-C Pros. Sup. S-21.

---

[8] For some mortgage loans, the borrower, or a relative of the borrower, pledged additional collateral, such as securities, to secure the mortgage loans. In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors defined the term Effective Loan-to-Value Ratio as "a fraction, the numerator of which is the original Stated Principal Balance of the related Mortgage Loan, less the amount secured by the Additional Collateral required at the time of origination, if any, and the denominator of which is the appraised value of the related Mortgaged Property." MLCC 2004-C Pros. Sup. S-16.

COMPLAINT FOR RESCISSION -- Page 87

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1

        d.     The "Tabular Characteristics of the Mortgage Loans" section also

2

provided a similar table divided into 12 ranges of effective LTV for all of the mortgage

3

loans in the collateral pool. MLCC 2004-C Pros. Sup. S-21.

4

        e.     The "Tabular Characteristics of the Mortgage Loans" section also

5

6

provided a similar table divided into 13 ranges of original LTV for the subset of mortgage

7

loans in Pool 1 (from which Seattle Bank's certificate was to be paid). MLCC 2004-C Pros.

8

Sup. S-30.

9

        f.     The "Tabular Characteristics of the Mortgage Loans" section also

10

provided a similar table divided into 12 ranges of effective LTV for the subset of mortgage

11

loans in Pool 1. MLCC 2004-C Pros. Sup. S-30.

12

        g.     "*As of the Cut-off Date, the weighted average Original Loan-to-*

13

14

*Value Ratio of the Mortgage Loans was approximately 71.69%.*" MLCC 2004-C Pros. Sup.

15

S-21.

16

        h.     "As of the Cut-off Date, the weighted average Effective Loan-to-

17

Value Ratio of the Mortgage Loans was approximately 66.33%." MLCC 2004-C Pros. Sup.

18

S-21.

19

        i.     "The weighted average Effective Loan-to-Value Ratio at origination

20

of the Pool 1 Mortgage Loans was approximately 65.87%, and no Pool 1 Mortgage Loan

21

had an Effective Loan-to-Value Ratio at origination exceeding 95.00%." MLCC 2004-C

22

23

Pros. Sup. S-27.

24

        j.     "As of the Cut-off Date, the weighted average Original Loan-to-

25

Value Ratio of the Mortgage Loans in Pool 1 was approximately 71.32%." MLCC 2004-C

26

Pros. Sup. S-30.

COMPLAINT FOR RESCISSION – Page 88

**|||**

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

**100**

k.    "As of the Cut-off Date, the weighted average Effective Loan-to-Value Ratio of the Mortgage Loans in Pool 1 was approximately 65.87%." MLCC 2004-C Pros. Sup. S-30.

258.    These statements were untrue or misleading because (i) the stated LTVs of a significant number of those mortgage loans were lower than the actual LTVs or (ii) Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that the appraisals of a significant number of the properties that secured the mortgage loans in the collateral pool were biased upward, so that stated LTVs based on those appraisals were lower than the true LTVs of those mortgage loans.

259.    By these untrue and misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the LTVs of the mortgage loans in the collateral pool of this securitization were untrue or misleading**

260.    Seattle Bank repeats paragraphs 36 through 40.

261.    It is very probable that, because there was upward bias in appraisals throughout the mortgage loan industry during the time period before this securitization, a significant number of mortgage loans in the collateral pool of this securitization had upwardly biased appraisals.

**B.    Untrue or Misleading Statements about the Occupancy Status of the Properties That Secured the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of occupancy status**

262.    Seattle Bank repeats paragraphs 45 through 46.

COMPLAINT FOR RESCISSION – Page 89

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

2.      **Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization**

263. In the prospe   ctus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization.

a.      In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans" described in paragraph 257, Countrywide Securities and Merrill Lynch Mortgage Investors presented a table entitled "Occupancy Type." This table divided the loans in the collateral pool into the categories "Primary," "Second Home," and "Investment." For each category, the table stated the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding. MLCC 2004-C Pros. Sup. S-23.

b.      In the "Occupancy Type" table, Countrywide Securities and Merrill Lynch Mortgage Investors stated that 80.91% of the mortgage loans in the collateral pool, by aggregate principal balance outstanding, were secured by a "Primary" residence, 15.28% were secured by a "Second Home," and 3.81% were secured by an "Investment" property. MLCC 2004-C Pros. Sup. S-23.

c.      The "Tabular Characteristics of the Mortgage Loans" section of the prospectus supplement also presented a similar table divided into three categories of occupancy status for the subset of loans in Pool 1. In this table, Countrywide Securities and Merrill Lynch Mortgage Investors stated that 81.71% of the loans in Pool 1, by aggregate principal balance outstanding, were secured by a "Primary" residence, 14.34% were

COMPLAINT FOR RESCISSION – Page 90

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

secured by a "Second Home," and 3.95% were secured by an "Investment" property. MLCC 2004-C Pros. Sup. S-32.

264.    These statements were untrue or misleading because (i) the stated number of mortgage loans in the category "Primary" was higher than the actual number of loans in that category; (ii) the stated number of mortgage loans in the category "Second Home" was lower than the actual number of loans in that category; (iii) the stated number of mortgage loans in the category "Investment" was lower than the actual number of loans in that category; or (iv) Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that the occupancy status of a significant number of the properties that secured the mortgage loans in the collateral pool was misstated because of fraud.

265.    By these untrue and misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.    Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the occupancy status of the properties that secured the mortgage loans in the collateral pool of this securitization were untrue or misleading**

266.    Seattle Bank repeats paragraphs 50 through 51.

267.    It is very probable that, because there was widespread occupancy fraud throughout the mortgage loan industry during the time before this securitization, a significant number of the applicants for mortgage loans in the collateral pool of this securitization stated incorrectly that the properties that would secure the mortgage loans were to be their primary residences.

COMPLAINT FOR RESCISSION – Page 91

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**C.    Misleading Statements about the Credit Scores of the Borrowers Whose Mortgage Loans Were in the Collateral Pool of this Securitization**

**1.    The materiality of credit scores**

268.    Seattle Bank repeats paragraphs 53 through 54.

**2.    Misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization**

269. In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made the following statements about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization.

a.    In the section of the prospectus supplement entitled "Tabular Characteristics of the Mortgage Loans" described in paragraph 257, Countrywide Securities and Merrill Lynch Mortgage Investors presented a table entitled "Credit Score." This table divided the loans in the collateral pool into 12 categories of credit scores (for example, Not Available, 551 to 575, 576 to 600, etc.). For each category, the table stated the number of mortgage loans, the aggregate principal balance outstanding, and the percent of aggregate principal balance outstanding. MLCC 2004-C Pros. Sup. S-22.

b.    The "Tabular Characteristics of the Mortgage Loans" section of the prospectus supplement also presented a similar table divided into 11 categories of credit scores for the subset of loans in Pool 1. MLCC 2004-C Pros. Sup. S-31.

c.    "As of the Cut-off Date, the weighted average Credit Score of the Mortgage Loans with available Credit Scores was approximately 733." MLCC 2004-C Pros. Sup. S-22.

COMPLAINT FOR RESCISSION – Page 92

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

d.       "As of the Cut-off Date, the weighted average Credit Score of the Mortgage Loans in Pool 1 with available Credit Scores was approximately 733." MLCC 2004-C Pros. Sup. S-31.

270.    These statements were misleading because Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that a significant number of borrowers of the mortgage loans in the collateral pool of this securitization inflated their credit scores.

271. By    these misleading statements, Countrywide Securities and Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**3.      Basis of the allegations above that these statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the credit scores of the borrowers whose mortgage loans were in the collateral pool of this securitization were misleading**

272.    Seattle Bank repeats paragraphs 58 through 59.

273.    It is very probable that, because tradeline renting was widespread throughout the nonconforming mortgage loan industry during the time before this securitization, many of the borrowers of the mortgage loans in the collateral pool of this securitization raised their credit scores by tradeline renting.

**D.      Failure to Disclose the Substantial Deterioration of LTV and Credit Score as Predictors of the Performance of Mortgage Loans Securitized by Countrywide Securities**

274.    Seattle Bank repeats paragraphs 256 through 273.

275.    Seattle Bank repeats paragraph 62.

276.    In the prospectus supplement and other documents they sent to Seattle Bank, Countrywide Securities and Merrill Lynch Mortgage Investors made statements about the

COMPLAINT FOR RESCISSION – Page 93

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

LTVs and credit scores of the mortgage loans in the collateral pool, as summarized above. All of those statements are incorporated in this paragraph by reference.

277.    During the time before this securitization, the power of LTV and credit score to predict the performance of otherwise similar nonconforming mortgage loans deteriorated, even after taking account of declines in house prices and other macroeconomic factors. Put somewhat differently, loans that were very similar in these characteristics performed worse if the loans were made in 2004 than if they were made in 2003, worse if made in 2003 than if made in 2002, etc.

278.    This deterioration in the credit quality of mortgage loans with ostensibly similar credit characteristics was true in particular of nonconforming loans securitized by Countrywide Securities or its affiliates. As Figure 1 in paragraph 65 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from quarter to quarter from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores. As Figure 2 in paragraph 66 makes clear, the credit quality of the loans securitized by Countrywide Securities or its affiliates deteriorated steadily from 2004 to 2007, even though those loans had very similar reported LTVs and credit scores.

279.    All statements that Countrywide Securities and Merrill Lynch Mortgage Investors made about the LTVs and credit scores of the mortgage loans in the collateral pool of this securitization were misleading because those defendants omitted to state that, in the time before this securitization, loans that Countrywide Securities securitized were nearly constant in weighted average LTV and weighted average credit score, yet performed

COMPLAINT FOR RESCISSION – Page 94

YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

worse if the loans were made in 2004 than if they were made in 2003, worse if made in

2003 than if made in 2002, etc.

280. By these misleading statements, Countrywide Securities and Merrill Lynch

Mortgage Investors materially understated the risk of the certificate issued by Merrill Lynch

Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

**E.    Untrue or Misleading Statements about the Underwriting Guidelines of the Originator of the Mortgage Loans in the Collateral Pool of this Securitization**

**1.    The materiality of underwriting guidelines and the extent of compliance with them**

281. Seattle Bank repeats paragraph 71.

**2.    Untrue or misleading statements by Countrywide Securities and Merrill Lynch Mortgage Investors about the underwriting guidelines of the originator of the mortgage loans in the collateral pool of this securitization and about the extent of their compliance with those guidelines**

282. On pages S-53 through S-58 of the prospectus supplement, Countrywide

Securities and Merrill Lynch Mortgage Investors made statements about the underwriting

guidelines of Merrill Lynch Credit Corporation, which originated or acquired all of the

mortgage loans in the collateral pool of this securitization. All of those statements are

incorporated here by reference.

283. One of these statements was that: "The above described underwriting

guidelines may be varied in certain cases, on the basis of compensating factors, as deemed

appropriate by MLCC's underwriting personnel." MLCC 2004-C Pros. Sup. S-58.

284. On information and belief, these statements were untrue or misleading

because Countrywide Securities and Merrill Lynch Mortgage Investors omitted to state that:

(a) Merrill Lynch Credit Corporation was making frequent, and increasingly frequent,

COMPLAINT FOR RESCISSION – Page 95

1   exceptions to those underwriting guidelines; (b) Merrill Lynch Credit Corporation was

2   making frequent, and increasingly frequent, exceptions to those underwriting guidelines

3   when no compensating factor was present; (c) Merrill Lynch Credit Corporation was

4   making wholesale, rather than case-by-case, exceptions to underwriting guidelines; and (d)

5   Merrill Lynch Credit Corporation was failing frequently, and increasingly frequently, to

6   follow quality-assurance practices intended to detect and prevent fraud.

7   

8   285. By    these untrue or misleading statements, Countrywide Securities and

9   Merrill Lynch Mortgage Investors materially understated the risk of the certificate issued by

10  Merrill Lynch Mortgage Investors Trust 2004-C that they offered and sold to Seattle Bank.

11  

12  **3.     Basis of the allegations above that these statements by Countrywide
         Securities and Merrill Lynch Mortgage Investors about the
13       underwriting guidelines of the originator of the mortgage loans in the
         collateral pool of this securitization, and about the extent of their
14       compliance with those guidelines, were untrue or misleading**

15  286.    Seattle Bank repeats paragraph 76.

16  **F.     Claim for Rescission**

17  287.    Under RCW 21.20.010 and 21.20.430(1), Seattle Bank is entitled to recover

18  the consideration that it paid for this certificate, $9,944,998, plus interest of 8% per annum

19  from September 1, 2004, to the date on which it recovers the $9,944,998, plus its costs and

20  the reasonable fees of its attorneys in this action, less the amount of income it has received

21  on the certificate. Pursuant to RCW 21.20.430(6), Seattle Bank will tender the certificate

22  before entry of judgment.

23  

24  

25  

26  

COMPLAINT FOR RESCISSION – Page 96

**|||**
YARMUTH  WILSDON  CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**108**

## XI. PRAYER FOR RELIEF

WHEREFORE, Seattle Bank respectfully demands payment of the amount it paid to purchase each certificate, together with interest on that amount at the rate of 8% per annum from the date on which Seattle Bank purchased each certificate until the date on which it receives payment, and its costs and attorneys' fees in this action, all as provided by RCW 21.20.430(1).

## JURY DEMAND

SEATTLE BANK DEMANDS TRIAL BY SIX PERSON JURY OF ALL ISSUES SO TRIABLE.

Dated: December 23, 2009

YARMUTH WILSDON CALFO PLLC

By: _____
Richard C. Yarmuth, WSBA #4990
Matthew Carvalho, WSBA #31201

818 Stewart Street
Seattle, Washington 98101
(206) 516-3800
(206) 516-3888 (fax)

GRAIS & ELLSWORTH LLP
70 East 55th Street
New York, New York 10022
(212) 755-0100
(212) 755-0052 (fax)

COMPLAINT FOR RESCISSION – Page 97

iii
YARMUTH WILSDON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800  F 206.516.3888

600.01 jl233502 12/23/09

109

**FILED**

09 DEC 28 PM 2:18

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46321-2 SEA

1

2

3

4

5

6

7

8

9          SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

10   FEDERAL HOME LOAN BANK OF          No. 09-2-46321-2 SEA
     SEATTLE, a bank created by federal law,

11                Plaintiff,                  SUMMONS [60 DAYS]

12          v.

13   COUNTRYWIDE SECURITIES
     CORPORATION, a California corporation;
14   CWALT, INC., a Delaware corporation;
     COUNTRYWIDE FINANCIAL
15   CORPORATION, a Delaware corporation;
     MERRELL LYNCH MORTGAGE
16   INVESTORS, INC., a Delaware corporation;
     and MERRILL LYNCH MORTGAGE
17   CAPITAL, INC., a Delaware corporation,

18                Defendants.

19

20   **TO THE DEFENDANTS:** A lawsuit has been started against you in the above entitled

21   court by FEDERAL HOME LOAN BANK OF SEATTLE. Plaintiff's claim is stated in the

22   written complaint, a copy of which is served upon you with this summons.

23          In order to defend against this lawsuit, you must respond to the complaint by stating

24   your defense in writing, and by serving a copy upon the person signing this summons

25   within 60 days after the service of this summons, excluding the day of service, or a default

26   judgment may be entered against you without notice. A default judgment is one where

SUMMONS [60 DAYS] – Page 1

YARMUTH WILSON CALFO
818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

1  plaintiff is entitled to what he asks for because you have not responded.  If you serve a

2  notice of appearance on the undersigned person, you are entitled to notice before a default

3  judgment may be entered.

4         You may demand that the plaintiff file this lawsuit with the court.  If you do so, the

5  demand must be in writing and must be served upon the person signing this summons.

6  Within 14 days after you serve the demand, the plaintiff must file this lawsuit with the

7  court, or the service on you of this summons and complaint will be void.

8         If you wish to seek the advice of an attorney in this matter, you should do so

9  promptly so that your written response, if any, may be served on time.

10        This summons is issued pursuant to rule 4 of the Superior Court Civil Rules of the

11 State of Washington and Revised Code of Washington 4.28.180.

12        DATED:  December 23, 2009.

13                                YARMUTH WILSDON CALFO PLLC

14

15 By: _____
                                Richard C. Yarmuth, WSBA #4990
16                              Matthew A. Carvalho, WSBA #31201

17                              818 Stewart Street, Suite 1400
                                Seattle, WA  98101
18                              Telephone:  206.516.3800

19

20                              GRAIS & ELLSWORTH LLP
                                70 East 55th Street
21                              New York, New York 10022
                                (212) 755-0100
22                              (212) 755-0052 (fax)

23

24

25

26

500.01 fl213506 12/23/09
SUMMONS [60 DAYS] – Page 2

**III**

YARMUTH WILSDON CALFO

818 STEWART STREET, SUITE 1400
SEATTLE WASHINGTON 98101
T 206.516.3800   F 206.516.3888

**FILED**

09 DEC 23 PM 2:13

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 09-2-46321-2 SEA

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
# IN AND FOR THE COUNTY OF KING

| | |
|---|---|
| Federal Home Loan Bank of Seattle | NO. 09-2-46321-2    SEA |
| | Order Setting Civil Case Schedule (*ORSCS) |
| **Plaintiff(s)** vs | |
| Countrywide Securities Corporation, et al. | ASSIGNED JUDGE Downing _____ 43 |
| | FILE DATE:                        12/23/2009 |
| **Defendant(s)** | TRIAL DATE:                    06/13/2011 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I. NOTICES

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule (Schedule)** on the Defendant(s) along with the **Summons and Complaint/Petition.** Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the **Summons and Complaint/Petition** or (2) service of the Defendant's first response to the **Complaint/Petition**, whether that response is a **Notice of Appearance**, a response, or a Civil Rule 12 (CR 12) motion. The **Schedule** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

*"I understand that I am required to give a copy of these documents to all parties in this case."*

| | |
|---|---|
| Print Name | Sign Name |

Order Setting Civil Case Schedule (*ORSCS)            REV. 12/08    1

**112**

## I. NOTICES (continued)

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLR*] -- especially those referred to in this *Schedule*. In order to comply with the *Schedule*, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$200** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and cross-claims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $220 arbitration fee.** If a party seeks a trial de novo when an arbitration award is appealed, a fee of $250 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
All parties will be assessed a fee authorized by King County Code 4.71.050 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| CASE EVENT | DEADLINE or EVENT DATE | Filing Needed |
|---|---|---|
| Case Filed and Schedule Issued. | Wed 12/23/2009 | * |
| Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*]. **$220 arbitration fee must be paid** | Wed 06/02/2010 | * |
| DEADLINE to file Confirmation of Joinder if not subject to Arbitration. [*See KCLCR 4.2(a) and Notices on Page 2*]. | Wed 06/02/2010 | * |
| DEADLINE for Hearing Motions to Change Case Assignment Area. [*See KCLCR 82(e)*] | Wed 06/16/2010 | |
| DEADLINE for Disclosure of Possible Primary Witnesses [*See KCLCR 26(b)*]. | Mon 01/10/2011 | |
| DEADLINE for Disclosure of Possible Additional Witnesses [*See KCLCR 26(b)*]. | Tue 02/22/2011 | |
| DEADLINE for Jury Demand [*See KCLCR 38(b)(2)*]. | Mon 03/07/2011 | * |
| DEADLINE for Setting Motion for a Change in Trial Date [*See KCLCR 40(d)(2)*]. | Mon 03/07/2011 | * |
| DEADLINE for Discovery Cutoff [*See KCLCR 37(g)*]. | Mon 04/25/2011 | |
| DEADLINE for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | Mon 05/16/2011 | |
| DEADLINE for Exchange Witness & Exhibit Lists & Documentary Exhibits [*See KCLCR 4(j)*]. | Mon 05/23/2011 | |
| DEADLINE to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(2)*] | Mon 05/23/2011 | * |
| DEADLINE for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | Tue 05/31/2011 | |
| Joint Statement of Evidence [*See KCLCR (4)(k)*]. | Mon 06/06/2011 | * |
| DEADLINE for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file Proposed Findings of Fact and Conclusions of Law with the Clerk) | Mon 06/06/2011 | * |
| Trial Date [*See KCLCR 40*]. | Mon 06/13/2011 | |

### III. ORDER

Pursuant to King County Local Civil Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above. Penalties, including but not limited to sanctions set forth in Local Civil Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance. It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.

DATED:   12/23/2009

**PRESIDING JUDGE**

Order Setting Civil Case Schedule (*ORSCS)

REV. 12/08    3

**114**

## IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule.  The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:**  If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:**  Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges.  The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx .

### CASE SCHEDULE AND REQUIREMENTS
Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

### A. Joint Confirmation regarding Trial Readiness Report:
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g. interpreters, equipment, etc.).

The form is available at http://www.kingcounty.gov/courts/superiorcourt.aspx .  If parties wish to request a CR 16 conference, they must contact the assigned court.  Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding said report.

### B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand.  Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held.  FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

**C. Trial:**  Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court.  The Friday before trial, the parties should access the King County Superior Cour website http://www.kingcounty.gov/courts/superiorcourt.aspx to confirm trial judge assignment.  Information can also be obtained by calling (206) 205-5984.

### MOTIONS PROCEDURES

### A. Noting of Motions

**Dispositive Motions:**  All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge.  The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules.  Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part.  The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**115**

**Nondispositive Motions:** These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered. All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements. Rather than noting a time of day, the Note for Motion should state "Without Oral Argument." Local Civil Rule 7 governs these motions, which include discovery motions. The local civil rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge. All other motions should be noted and heard on the Family Law Motions calendar. Local Civil Rule 7 and King County Family Law Local Rules govern these procedures. The local rules can be found at http://www.kingcounty.gov/courts/superiorcourt/civil.aspx.

**Emergency Motions:** Under the court's local civil rules, emergency motions will be allowed only upon entry of an Order Shortening Time. However, emergency discovery disputes may be addressed by telephone call and without written motion, if the judge approves.

### B. Original Documents/Working Copies/ Filing of Documents

**All original documents must be filed with the Clerk's Office.** Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the new requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court. The exceptions to the e-filing requirement are also available on the Clerk's Office website.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge. The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom. Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator. On June 1, 2009 you will be able to submit working copies through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk.

**Service of documents.** E-filed documents may be electronically served on parties who opt in to E-Service within the E-Filing application. The filer must still serve any others who are entitled to service but who have not opted in. E-Service generates a record of service document that can be e-filed. Please see information on the Clerk's office website at www.kingcounty.gov/courts/clerk regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion. Do not file the original of the proposed order with the Clerk of the Court. Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.

**Presentation of Orders:** All orders, agreed or otherwise, must be presented to the assigned judge. If that judge is absent, contact the assigned court for further instructions. If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**116**

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the assigned judge or in the Ex Parte Department.** Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department. **If final order and/or formal proof are entered in the Ex Parte Department, counsel is responsible for providing the assigned judge with a copy.**

**C.     Form**

Memoranda/briefs for matters heard by the assigned judge may not exceed twenty four (24) pages for dispositive motions and twelve (12) pages for nondispositive motions, unless the assigned judge permits over-length memoranda/briefs in advance of filing. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

*IT IS SO ORDERED.  FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS.  PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.*

_____

**PRESIDING JUDGE**

**117**

King County
Department of Judicial Administration
Superior Court Clerk's Office

**<u>IMPORTANT NOTICE</u>**

**KING COUNTY SUPERIOR COURT HEARING LOCATIONS WILL CHANGE**

**IF THE MALENG REGIONAL JUSTICE CENTER IN KENT IS EVACUATED**

Potential serious flooding of the Green River Valley is a possibility this year based on issues with the Howard Hanson Dam.  The US Army Corps of Engineers is making the necessary repairs to the dam; however until the work is completed, the Maleng Regional Justice Center in Kent will be on an evacuation alert status.

The Clerk's Office and Superior Court remains committed to providing good customer service throughout the flood evacuation period.  If it becomes necessary to evacuate the Maleng Regional Justice Center and relocate the courtrooms, location changes to scheduled court proceedings at the King County Courthouse in Seattle may also occur.

**If you have a court proceeding scheduled either at the King County Courthouse in Seattle or at the Maleng Regional Justice Center in Kent, please call (206) 296-9300 to find out if there is a change to the location of your court proceeding.  Call within 2 days of your scheduled court date for the latest information.**

Updated information will also be posted here:

King County Superior Court's website:  http://www.kingcounty.gov/courts/superiorcourt

King County Clerk's Office website: http://www.kingcounty.gov/courts/Clerk

We thank you for your patience during this time.

**118**